# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 8, 2016    Decided April 1, 2016

No. 15-7040

MARIETTA ROBINSON,
APPELLANT

v.

SARAH PEZZAT, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00302)

*Tobias S. Loss-Eaton* argued the cause for appellant. With him on the briefs was *Frank R. Volpe*.

*John D. Martorana*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General. *Holly M. Johnson*, Assistant Attorney General, entered an appearance.

Before: GARLAND,\* *Chief Judge*, TATEL, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: We return once again to the familiar yet significant issue of the proper role of the district court at summary judgment. In this section 1983 action, plaintiff sought to hold police officers liable for unlawfully seizing her property in violation of the Fourth Amendment when the officers shot and killed her dog while executing a search warrant. The district court granted summary judgment to the officer who first shot the dog on the grounds that plaintiff's eyewitness account of the shooting was uncorroborated and contradicted by other evidence. Because the district court improperly assumed the "jury functions" of making "[c]redibility determinations, . . . weighing . . . the evidence, and . . . drawing . . . legitimate inferences from the facts," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), we reverse this portion of the judgment. We affirm the grant of summary judgment to another officer who shot the dog, as well as to the District of Columbia.

**I.**

In the summer of 2010, the Metropolitan Police Department (MPD) obtained a warrant to search appellant Marietta Robinson's home after her grandson was arrested while in possession of marijuana. Around 9 p.m. on the evening of June 15, a police squad consisting of nine officers

_____

\*Chief Judge Garland was a member of the panel at the time the case was argued but did not participate in this opinion.

arrived at Robinson's house to execute the warrant. In her deposition, Robinson testified that when she heard someone "knocking very hard" on the door, her dog Wrinkles, a thirteen-year-old female pit bull/German shepherd mix, "barked to let [her] know that somebody was there." Robinson Dep. at 15, 24. Having owned Wrinkles since she was a puppy, Robinson acknowledged that the dog would sometimes bark and growl when "stranger[s] [came] in the house." *Id.* at 16–17.

Robinson testified that after the police identified themselves, she opened the inner door to her home, leaving the screen door in place. Wrinkles barked again, then "sat down and [was] quiet." *Id.* at 23. According to several officers, however, Wrinkles "lunge[d] out," "showing [her] teeth" in an aggressive manner. McLeod Dep. at 42; *see also* Selby Dep. at 94; Boteler Dep. at 112. Both Robinson and the officers agree about what happened next: Robinson asked the lead officer, appellee Sergeant James Boteler, if she could put Wrinkles "in the back yard or . . . in the bathroom" while the police executed the warrant and, in response, Boteler instructed her to place the dog in the bathroom, which was immediately adjacent to and visible from the front door. Robinson Dep. at 26, 31.

Boteler testified that he "yelled pretty loud" to the officers behind him to warn them that there was a "dog in the bathroom." Boteler Dep. at 73–74. Officer Sarah Pezzat, another appellee, testified that although she never heard a warning, she knew that a dog was in the house because she "could easily hear the dog barking and growling." Pezzat Dep. at 69. Pezzat also testified that she heard Boteler and

Robinson discussing where to put the dog and "something about the dog being in a backroom." *Id.*

When Robinson opened the front door after securing Wrinkles, the officers rushed inside. Pezzat, with gun drawn, was at least the fifth officer to enter the home. After several others bypassed the bathroom, Pezzat opened the door, which Boteler testified violated police protocol. Typically, Boteler explained, the first officer to encounter a door would "stop, clear that area, and then move to the next area," unless there was a reason not to do so, such as the presence of a dog, which was "why several officers passed that door and did not open that door." Boteler Dep. at 100–02. Other officers warned that there was a "[d]og on the left" as the search team entered, Ledesma Dep. at 23, 46–47, and heard Wrinkles barking. Pezzat recalled hearing no such warnings.

Robinson testified that while standing near the entryway, she saw Pezzat open the bathroom door, "sho[o]t once, and then Wrinkles comes running out, got up and ran out the bathroom. Then [Pezzat] shot again. Then she backed out my door." Robinson Dep. at 44. Repeating the point, Robinson testified that "[w]hen [Pezzat] shot the first time, Wrinkles got up. And when Wrinkles got up to come towards her, then she shot again." *Id.* at 45–46. When the District of Columbia's attorney asked whether it was Robinson's testimony "that Wrinkles was on the floor—lying on the floor" in the bathroom, Robinson replied, "Yes." *Id.* at 46. Asked how she knew that, Robinson explained, "Because when she first opened the door—when she had the gun in her hand, at first I . . . thought she was going to shoot me. But then when she . . . turned the [k]nob and pushed the door, . . . it wasn't pointed

towards me no more." *Id.* Robinson then testified—for the third time—that "the first shot, Wrinkles got up. . . . The second shot, Wrinkles ran out the bathroom." *Id.* at 47.

After Wrinkles made it out of the bathroom, Robinson testified, the dog ran to her and collapsed on the ground. Although Robinson never saw Wrinkles bite Pezzat, she acknowledged that Wrinkles would have bitten the officer "[i]n defense of herself, after being shot at . . . . [I]f you shoot a dog, most likely they're going to attack you." *Id.* at 55.

Officer Pezzat had a very different view of what happened. She testified that after opening the bathroom door, she "saw that there was a dog inside of the room. I tried to close the door, but it was too late. The dog was already coming out of the room at me. And I picked up my leg to protect myself, and the dog bit down on my foot" once "the dog was already most of the way out of the room." Pezzat Dep. at 73, 81. According to Pezzat, it was at that point—after the dog bit her—that she shot the animal. Echoing Pezzat, another officer, appellee Christian Glynn, testified that before Pezzat fired, Wrinkles "was barking, very angry and charged at Officer Pezzat," then "latched on and bit Officer Pezzat's foot and started shaking her" and "pulling her down and into the bathroom." Glynn Dep. at 58–59. Sergeant Boteler testified that before hearing any gunfire, he too saw Wrinkles biting Pezzat "just outside the bathroom in the hallway." Boteler Dep. at 104.

Although Robinson testified that Wrinkles collapsed next to her feet after the shooting, Officer Richard McLeod, also an appellee, testified that Wrinkles began "coming towards"

him, deeper into the house. McLeod Dep. at 43. Another officer testified that McLeod fired at least a half-dozen shots at Wrinkles, toward the front of the house. According to Robinson, Wrinkles fled up the stairs to get away from the shots, but McLeod kept firing. In the end, officers blocked Wrinkles from climbing the stairs, and she died on the landing.

According to Robinson, officers then took her clean laundry from the top of the washing machine and "cover[ed] the dog up and the blood up with my clean clothes." Robinson Dep. at 77–78. Officer Adrian Ledesma testified that they covered Wrinkles "with like a white sheet or something like that," Ledesma Dep. at 33, and Boteler confirmed that he placed one of Robinson's sheets over Wrinkles' body. While searching the house, officers left bloody "fingerprints on [Robinson's] curtains"; "two whole [bloody] handprints" and a third partial print on Robinson's sofa, which she had to throw away; bloody handprints on the walls and doors, "inside the closet," and "[o]n the two fans . . . in the living room"; "smudges of blood on . . . [e]very picture that was on the wall that came down"; and blood "splattered all over" a painting made by Robinson's brother, which looked like "somebody had just took and threw blood." Robinson Dep. at 62, 66–73. Robinson kept a water cooler "at [her] front door," and after the officers left, "you could see the blood where they washed their hands. Blood there and fingerprints all over." *Id.* at 80. Robinson also saw officers "jumping on" her clothes dryer multiple times, breaking the door. *Id.* at 79. Boteler acknowledged that the police did nothing to clean up the house, and recalled a captain saying that "the dog's blood is

her property. It's going to be up to her or her family to clean it up, not us." Boteler Dep. at 130–31.

Mrs. Robinson filed a complaint in the U.S. District Court for the District of Columbia against Officers Pezzat and McLeod, several other officers involved in the shooting and the search, and the District of Columbia, seeking damages under 42 U.S.C. § 1983 and various D.C. statutes. Robinson alleged, among other claims, that the officers had made illegal seizures under the Fourth Amendment both by shooting Wrinkles and by damaging her property during the subsequent search.

The district court granted summary judgment for defendants on all claims. It first found that "[t]here is no genuine dispute that Wrinkles posed an imminent threat" to the officers and that their conduct was thus reasonable. *Robinson v. Pezzat*, 83 F. Supp. 3d 258, 267–68 (D.D.C. 2015). The court explained:

> Plaintiff argues that her uncorroborated version of events creates a genuine dispute of material fact precluding summary judgment. I disagree. To withstand summary judgment, a plaintiff must advance more than a scintilla of doubt as to her claims. Unsubstantiated allegations of harm fall short of this standard, making dismissal imminently [sic] more likely where, as here, a plaintiff's claims are contradicted, and overborn, by a record of credible evidence.

*Id.* (internal citations omitted). According to the court, "several undisputed facts corroborate defendants' account":

(1) "that Wrinkles had a history of aggression," as evidenced both by Robinson's statements that Wrinkles would sometimes "bark and growl" at strangers and a veterinarian report from 2006, which stated that Wrinkles was "aggressive"; (2) that "Wrinkles barked and growled at the search team, prompting plaintiff to place the dog in the downstairs bathroom"; (3) that "Wrinkles bit, shook, and attempted to bodily drag Officer Pezzat into the bathroom," injuring her; and (4) that "even after being shot, the dog charged two other police officers stationed on the staircase, prompting them to take cover behind a protective shield." *Id.* at 262, 267. The court concluded that "given Wrinkles' threatening behavior, the government's interest in safeguarding the lives of its officers, and the pressure of split-second decision making," Pezzat's and McLeod's decisions were "eminently reasonable." *Id.* at 267.

The district court also rejected Robinson's property-damage claim, ruling that "[t]he damage here was reasonable under the circumstances." *Id.* at 268. The court first concluded that "the immediate damage to plaintiff's clothing, furniture, and walls from Wrinkles' shooting was incident to a reasonable seizure and, therefore, is within the realm of constitutionality." *Id.* "[A]ny subsequent damage to plaintiff's personal items," the court continued, "was the product of a reasonable search" because, by virtue of a "broadly-worded warrant authoriz[ing] defendants to search plaintiff's residence for concealed drugs," the officers "had every reason, indeed, every right, to search in closets, beneath sofas, and behind picture frames for concealed drugs." *Id.* As for the bloody handprints, the court concluded that "[the] blood made its way onto plaintiff's fixtures as the officers turned on light

switches, lifted furniture, and removed wall hangings is neither remarkable nor unduly destructive." *Id.*

In granting summary judgment to the District of Columbia, the court ruled that Robinson had failed to show that the District could be held liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The court explained that Robinson could "point to no formal policy sanctioning the indiscriminate killing of household pets, let alone one that catalyzed the shooting here," and that MPD policy "restrict[ed] the use of deadly force to self-defense." *Robinson*, 83 F. Supp. 3d at 269. And although Robinson had provided the court with twenty-one police reports documenting dog shootings during home searches between 2002 and 2009, the court found those reports insufficient to demonstrate that the District was deliberately indifferent to a risk of constitutional violations because "even if these incidents placed the District on notice of domestic animal shootings, plaintiff has tendered no evidence suggesting that the majority of these shootings were unconstitutional." *Id.* (internal quotation marks and alteration omitted). Nor, the court concluded, had Robinson "articulated how improved training would have prevented Wrinkles' death." *Id.* at 270.

Having rejected Robinson's federal claims, the court declined to exercise supplemental jurisdiction over her District of Columbia law claims. Accordingly, it dismissed those claims without prejudice. *Id.* at 271.

Robinson appeals, arguing that the district court improperly rejected her sworn testimony, which she believes

raises a genuine dispute of material fact regarding whether Wrinkles posed an imminent threat to Pezzat before the shooting. Robinson raises four additional arguments: (1) that even if her testimony could be disregarded, a jury could find unreasonable Pezzat's decision to open the door, which sparked the confrontation with Wrinkles; (2) that the district court erred in granting summary judgment on her property-damage claim because the seizure of Wrinkles, which caused much of the blood damage, was unreasonable, and the other damage following the dog's death was independently unreasonable; (3) that the district court erred in granting summary judgment in favor of McLeod because his decision to shoot the dog was unreasonable; and (4) that the District of Columbia should be liable for the officers' actions under *Monell* because it failed to provide adequate training for police officers who encounter dogs during home searches. "We review a district court's grant of summary judgment *de novo*." *DeGraff v. District of Columbia*, 120 F.3d 298, 301 (D.C. Cir. 1997).

## II.

We begin with the demise of Wrinkles. "Every circuit that has considered the issue has held that the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth Amendment." *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008); *see also Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d. Cir. 2013) (collecting cases). Those circuits have invariably concluded that "the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Viilo*, 547 F.3d at 710; *see also San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962,

975–78 (9th Cir. 2005) (holding that the killing of guard dogs was unreasonable under the Fourth Amendment where "the officers were not presented with exigent circumstances that necessitated killing the dogs"); *Brown v. Muhlenberg Township*, 269 F.3d 205, 210–11 (3d Cir. 2001) ("[T]he state's interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger. In the latter case, the state's interest may even justify the extreme intrusion occasioned by the destruction of the pet in the owner's presence. This does not mean, however, that the state may, consistent with the Fourth Amendment, destroy a pet when it poses no immediate danger and the owner is looking on, obviously desirous of retaining custody." (footnotes omitted)). As in any Fourth Amendment case, "[w]e analyze [the] question [of whether a pet constitutes an imminent threat] from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This analysis "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

The question for the district court, then, was whether, given all of the circumstances and viewed from the perspective of a reasonable officer on the scene, Wrinkles posed an imminent threat to Officer Pezzat before the shooting. Because the District of Columbia moved for summary judgment, Robinson must point to admissible evidence that creates a genuine dispute of material fact—that

is, a dispute that would allow "a reasonable jury [to] return a verdict" in her favor—on this precise question. *Anderson*, 477 U.S. at 248. As noted above, Robinson testified that Wrinkles posed no threat to the police because Pezzat shot the dog while she was lying on the floor: "[T]he first shot, Wrinkles got up. . . . The second shot, Wrinkles ran out the bathroom." Robinson Dep. 47. For her part, Pezzat testified that Wrinkles represented a threat because—before she fired her gun—the dog "was already coming out of the room at me" and "bit down on my foot." Pezzat Dep. at 73. The district court concluded that Pezzat acted reasonably because Robinson's "uncorroborated" testimony failed to create a genuine dispute as to whether Wrinkles constituted an imminent threat. *Robinson*, 83 F. Supp. 3d at 267. As District counsel wisely conceded at oral argument, this was error. Oral Arg. Tr. 32 ("The Court: [T]hat the district judge said her testimony is uncorroborated, that's irrelevant, isn't it? Counsel: It is.").

In order to determine whether the moving party is entitled to summary judgment, we, like the district court, "examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to" the nonmoving party, here Mrs. Robinson. *DeGraff*, 120 F.3d at 299–300 (internal quotation marks omitted). Under this standard, "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. This mode of analysis serves to separate the "jury functions" of making "[c]redibility determinations, . . . weighing . . . the evidence, and . . . drawing . . . legitimate inferences from the facts" from the district court's role as the arbiter of legal questions. *Id.* Thus, "[a]lthough a jury might ultimately decide to credit the version of the events described by the defendants over that offered by the plaintiff, this is not

a basis upon which a court may rest in granting a motion for summary judgment." *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006) (internal quotation marks omitted). Indeed, the summary judgment standard requires us to credit the plaintiff's version of events, even if "directly contradictory" to other testimony. *Tolan v. Cotton*, 134 S. Ct. 1861, 1867 (2014). The Supreme Court, rejecting a lower court's refusal to credit a plaintiff's uncorroborated testimony, recently explained it this way:

> The witnesses on both sides come to th[e] case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to [the nonmoving party's] competent evidence, the court below neglect[s] to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

*Id.* at 1868.

Given these standards, we think it quite obvious that the uncorroborated nature of Robinson's testimony had nothing at all to do with the question before the district court: did Robinson present a genuine dispute of material fact as to whether Wrinkles posed an imminent threat to Pezzat's safety? Corroboration goes to credibility, a question for the jury, not the district court. Perhaps a jury will disbelieve Robinson because her testimony was uncorroborated, but at this stage of the litigation, the district court must "believe[]"

her testimony and must not make "[c]redibility determinations." *Anderson*, 477 U.S. at 255.

Our decision in *Arrington v. United States* illustrates this point. There, the plaintiff brought a section 1983 action alleging excessive force, claiming that "he was beaten by police officers after he was captured, restrained, disarmed, and handcuffed." 473 F.3d at 331. According to the police officers, "force was used to subdue [the plaintiff] while he was armed and before he was in handcuffs." *Id.* at 336. The government argued that the plaintiff's "conclusory, unsubstantiated statements . . . unsupported by specific facts [were] insufficient to overcome a summary judgment motion." *Id.* We rejected that argument, holding that "a plaintiff may defeat a summary judgment granted to a defendant if the parties' sworn statements are materially different." *Id.* (internal quotation marks omitted) (citing *Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999)). It made no difference that the plaintiff's testimony was uncorroborated. All that mattered was that the testimony created a genuine issue of material fact. Although acknowledging that "'some statements are so conclusory as to come within an exception to that rule,'" we concluded that the plaintiff's allegations "f[ound] support in sworn deposition testimony filed in the District Court." *Id.* at 336, 338 (quoting *Greene*, 164 F.3d at 675). "Possessed of this testimony," we explained, "a jury can assess the validity of [the plaintiff's] claims." *Id.* at 338; *see also Harris v. U.S. Department of Veterans Affairs*, 776 F.3d 907, 914–15 (D.C. Cir. 2015) (holding that conflicting statements from plaintiff and police officers raised genuine disputes of material fact in excessive force case); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per

curiam) (holding that summary judgment was inappropriate when the plaintiff's account of what happened during a meeting differed from his supervisor's recollection); *Johnson v. District of Columbia*, 528 F.3d 969, 977 (D.C. Cir. 2008) (holding that "[s]ummary judgment was premature because there exists a genuine issue of material fact" that could "only be resolved by evaluating the conflicting testimony of" two people involved in an altercation). As in *Arrington*, it is up to the jury, not the district court, to "assess the validity of" plaintiff's uncorroborated version of events. 473 F.3d at 338.

Although the District of Columbia agrees with all of this, it nonetheless argues that we can sustain the district court's rejection of Robinson's testimony for two independent reasons. First, the District contends that the court properly refused to credit Robinson's testimony because she never expressly stated that she saw Wrinkles lying on the bathroom floor. This, the District argues, "demonstrate[s] that Robinson lacked personal knowledge for her allegation that the dog was simply lying on the floor when Officer Pezzat shot it and that it was not in fact attacking Officer Pezzat." Appellees' Br. 31. We disagree. As explained above, at summary judgment we "examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the plaintiff." *DeGraff*, 120 F.3d at 299–300 (internal quotation marks omitted). Given Robinson's testimony that she saw Pezzat open the door, her answering "yes" to the question whether she intended to testify that "Wrinkles was . . . lying on the floor" in the bathroom, Robinson Dep. at 46, and her repeated statements that Wrinkles "got up" after Pezzat fired, a jury could reasonably infer that Robinson saw Wrinkles lying on the bathroom floor.

The District insists that such an inference is unjustified because when its lawyer asked Robinson how she knew Wrinkles was lying down, Robinson "refused to say she actually saw these events," and instead gave an answer not directly responsive to counsel's question. Appellees' Br. 30. Again, we disagree. Accepting the District's argument would require that we draw an inference against Robinson notwithstanding her testimony explaining that she witnessed the scene and describing the precise order of events. We may not draw such an inference at summary judgment.

The District of Columbia next argues that we can sustain the district court's rejection of Robinson's testimony because, according to the District, the weight of evidence corroborating the officers' accounts fatally undermined Robinson's credibility. In support, the District invokes our decision in *Johnson v. Washington Metropolitan Area Transit Authority*, in which we recognized that a district court may "lawfully put aside testimony that is so undermined as to be incredible." 883 F.2d 125, 128 (D.C. Cir. 1989), *abrogated on other grounds by Robinson v. District of Columbia*, 580 A.2d 1255, 1258 (D.C. 1990). This circumstance, we explained, was "most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury." *Id.* Evidence satisfying this standard, such as a video tape that "quite clearly" demonstrates the falsity of the plaintiff's statement, rarely exists. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Indeed, in *Johnson* we identified only two instances in which this circuit rejected a plaintiff's testimony

as "so undermined as to be incredible," both of which involved testimony contradicted by multiple disinterested witnesses and, in one case, by the plaintiff herself. *See Johnson*, 883 F.2d at 128–29 (citing *Law v. Virginia Stage Lines*, 444 F.2d 990 (D.C. Cir. 1971), and *Washington, Marlboro & Annapolis Motor Lines v. Maske*, 190 F.2d 621 (D.C. Cir. 1951)).

In this case, the district court rejected Robinson's testimony because, in addition to it being uncorroborated, Wrinkles had a "history of aggression" (based primarily on the 2006 veterinary report), "barked and growled at the search team," bit Pezzat, and "charged" the officers standing on the stairs after McLeod shot the dog. *Robinson*, 83 F. Supp. 3d at 262, 267. In our view, however, none of this evidence is remotely compelling enough to require a jury to disregard Robinson's testimony as "so undermined as to be incredible." *Johnson*, 883 F.2d at 128. A jury could regard the years-old veterinary report and Wrinkles' barking at the police—as would most any self-respecting dog—to be of limited probative value to the question of exactly what happened when Pezzat opened the bathroom door. If the jury believed Robinson's testimony that Wrinkles was lying down, it could reasonably conclude that the dog acted aggressively toward Pezzat only after being shot. Finally, a jury could either credit Robinson's testimony that the dog ran up the stairs to escape McLeod or conclude that Wrinkles' behavior after being shot was of limited probative value.

To sum up, then, viewing the facts and all reasonable inferences most favorably to Robinson, we believe that a jury

could conclude that Pezzat acted unreasonably in shooting Wrinkles. Summary judgment was therefore inappropriate.

Seeking to avoid this result, the District urges us to affirm on an alternative ground, *i.e.*, that Pezzat is entitled to qualified immunity because she violated no clearly established law. "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This argument comes too late. In the district court, the District of Columbia argued only that Robinson suffered no constitutional injury; it never argued that the officers were entitled to qualified immunity on clearly established law grounds. *See* Defs.' Mot. for Summ. J. at 16–18, 23–25. This argument is thus forfeited. *See, e.g.*, *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal.").

Given that we are reversing the grant of summary judgment to Officer Pezzat, we shall also reverse the grant of summary judgment in favor of the officers on Robinson's claim that they violated the Fourth Amendment by unreasonably destroying her personal property during the shooting. As the district court observed, this claim is intertwined with Wrinkles' seizure. *See Robinson*, 83 F. Supp. 3d at 268. And because the district court will have to reconsider its property-damage analysis, we think it unwise at this point to consider whether the post-shooting damage was

independently unreasonable. Finally, because the district court never addressed Robinson's argument that a reasonable jury could find that Pezzat acted unreasonably when she opened the bathroom door, we decline to consider that issue as well.

## III.

We can easily dispose of Mrs. Robinson's claim that Officer McLeod acted unreasonably when he shot Wrinkles. Robinson does not dispute that Wrinkles had bitten Officer Pezzat and had run out of the bathroom by the time McLeod began firing. Nor does she dispute that events unfolded quickly—within a matter of seconds. Even were a jury to credit Robinson's testimony that Wrinkles ran to her and collapsed on the floor, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Given that Wrinkles bit Officer Pezzat hard enough to puncture her leather boots, McLeod's belief— just seconds later—that the dog continued to pose an imminent threat even absent additional aggressive behavior was hardly unreasonable. We shall thus affirm the district court's grant of summary judgment to Officer McLeod on this issue.

Mrs. Robinson's claim against the District requires a little more discussion. She argues that the District may be held liable for Pezzat's conduct under *Monell* because the MPD "failed to provide training to address a clear risk of constitutional violations" arising from dog shootings. Appellant's Br. 57. According to Robinson, this lack of

training contributed to a constitutional violation because "the search team arrived at Mrs. Robinson's home with no plan to deal with any animals they might encounter" or "protocol for ensuring that each officer knew where Wrinkles was secured." *Id.* at 64.

A plaintiff may establish a "policy or custom" under *Monell* by "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (internal quotation marks omitted). "Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard." *Id.* at 1307. Because a finding of liability in the context of a failure to train amounts to a judicial determination that "the city itself [decided] to violate the Constitution," the Supreme Court has imposed "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (internal quotation marks and alterations omitted). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train," although there are rare circumstances in which "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 62, 64 (internal quotation marks omitted). In the case of police officers, it will not

suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.

*City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

In this case, the district court found that the seven years' worth of police reports of dog shootings were insufficient to establish deliberate indifference because they gave no indication "that the majority of these shootings were unconstitutional." *Robinson*, 83 F. Supp. 3d at 269. Robinson nonetheless contends that the district court disregarded the risk that officers would encounter dogs during home searches and that some of those encounters would result in unnecessary shootings. In support, she relies on our decision in *Smith v. District of Columbia*, 413 F.3d 86, 100 (D.C. Cir. 2005), in which we held the District liable under *Monell* where it had failed to establish any standards at all for selecting independent living programs with which it placed at-risk youth, leading to a situation in which children "could be sent to totally inappropriate programs run by unqualified counselors and located in unsafe areas," risks that "were realized" when a substandard provider "failed to react to the murder of one youth and the armed robbery of another." Under those circumstances, the jury "may infer deliberate indifference from the District's failure to have adequate safeguards for dealing with situations fraught with risk." *Id.*

The situation here is very different from the one we confronted in *Smith*. Unlike there, the District has municipal regulations governing the conduct at issue. Those regulations allow police officers to discharge their firearms only in specified circumstances, including "[t]o kill a dangerous animal" and "[t]o defend him or herself or another from an attack which the officer has reasonable cause to believe could result in death or serious bodily injury." 6A DCMR § 207.2(a), (c). The MPD manual likewise authorizes the use of deadly force only "[w]hen it is necessary and objectively reasonable . . . [t]o defend [the officer] or another from an actual or threatened attack that is imminent and could result in death or serious bodily injury." Metropolitan Police, General Order GO-RAR-901.07, at 7 (2002). Unlike in *Smith*, moreover, where the District had provided employees with no relevant training, here the MPD gives officers specific training about how to identify and control dangerous dogs. Even if, as Robinson insists, the MPD could improve its training, *Monell* requires a plaintiff to do more than "prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *City of Canton*, 489 U.S. at 391. We also agree with the district court that the police reports of dog shootings provide no basis for a reasonable jury to conclude that the District had notice of a pattern of likely unconstitutional conduct adequate to prove deliberate indifference. Indeed, the reports that contain any detail at all invariably indicate that the dogs attacked the police officers, and thus fail to establish "[a] pattern of similar constitutional violations by untrained employees" or demonstrate such a risky environment that "the unconstitutional consequences of failing to train [were] so

patently obvious" that the city's reaction rises to "the functional equivalent of a decision by the city itself to violate the Constitution." *Connick*, 563 U.S. at 61–64.

## IV.

For the foregoing reasons, we reverse the grant of summary judgment to Officer Sarah Pezzat and affirm as to Officer Richard McLeod and the District of Columbia. Because we reverse the grant of summary judgment to Officer Pezzat, we also reverse the court's dismissal of Mrs. Robinson's District of Columbia law claims.

*So ordered.*