NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0495n.06

No. 18-1278

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>ALONZO BULLMAN, et al.</td><td>)</td><td rowspan="11"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiffs-Appellees,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>CITY OF DETROIT, MICHIGAN, et al.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendants-Appellants.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE:    GIBBONS, ROGERS, and STRANCH, Circuit Judges.

ROGERS, Circuit Judge.  During a narcotics raid in 2016, a Detroit police officer shot and killed two pit bulls belonging to the target of the raid, Joel Castro.  Two officers also stopped and searched the person and car of one of Castro's acquaintances, Alonzo Bullman, after observing Bullman circle the block while the raid was underway.  Castro, Bullman, and Nicole Motyka (a co-owner of the pit bulls) sued the City of Detroit and multiple Detroit police officers.  Among other things, the plaintiffs made the following claims: (1) the police officers stopped Bullman without reasonable suspicion, in violation of the Fourth Amendment and 42 U.S.C. § 1983; (2) the police officers searched Bullman's car without probable cause, in violation of the Fourth Amendment and 42 U.S.C. § 1983; and (3) the shooting of the pit bulls constituted an unreasonable seizure under the Fourth Amendment and 42 U.S.C. § 1983.  The district court denied qualified immunity to the police officers on each of the three claims.  Although qualified immunity was not

warranted for the search of Bullman's car and the shooting of the pit bulls, the police officers are entitled to qualified immunity for the stop of Bullman.

## I

The drug raid and traffic stop were conducted by Detroit police officers at a residence in Detroit, Michigan. On the day before the raid, Officer Johnny Fox had received an anonymous complaint that narcotics were being sold at the home of Joel Castro. Unknown to Officer Fox, Castro had obtained a medical marijuana license under the Michigan Medical Marihuana Act in November 2015. Castro grew marijuana plants on the second floor of his residence, and he regularly dispensed the marijuana to two patients. To investigate the narcotics complaint, Officer Fox collaborated with a confidential informant, who attempted to purchase marijuana from Castro on that same day before the raid. Castro refused to sell marijuana to the informant, but the informant observed Castro carrying a ziplock bag with a large amount of marijuana in it. Castro denied this, claiming that he did not "ever have any marijuana in [his] hand while speaking with [the informant.]" After the attempted controlled purchase failed, Officer Fox set up a fixed surveillance of Castro's home for 45 minutes. Fox observed two people "arrive [ ] independently" and conduct what appeared to be narcotics transactions with Castro.

Based on this information, Officer Fox obtained a search warrant for Castro's home, which the police executed in a narcotics raid in the early afternoon of the following day. At the time, Castro was playing video games in his living room with a friend, Chris Bullman. Three pit bulls (Blanca, Junior, and Yayo) were also in Castro's home, each of which weighed between 70 and 110 pounds. Blanca and Junior were in Castro's kitchen behind a wooden barricade that was over four feet tall, while Yayo was in the living room with Castro. Castro had placed three warning signs in front of his home. Two of the signs stated "Beware of dogs," and the third stated "Keep

out."  When a crew of Detroit police officers arrived at Castro's home, the commanding officer, Sergeant Severy, knocked and announced the narcotics raid.  According to Castro's Amended Complaint, the officers "forced entry immediately upon arriving at the door.  The police officers dispute this point, testifying that they waited at least five seconds before forcing entry.  Castro responded to the "first few slams against the door" by "grabb[ing] Yayo by his collar" and placing him into Castro's bedroom before the officers forcibly entered the residence.

Upon entering Castro's home, the officers ordered both Castro and Chris Bullman to lie on the ground.  Castro and Bullman immediately complied.  The parties disagree about what happened next.  According to Castro, the dogs "barked for a short time" when the police began breaking his front door.  However, "once [the police officers] were inside the house . . . , the dogs became quiet."  Blanca and Junior were "not attacking or being vicious in any way."  The Amended Complaint alleges that Blanca and Junior were "cowering in the corner of the kitchen" when the police officers entered Castro's home.  Castro claims that from his position on the ground he spent approximately two minutes pleading with the officers to refrain from killing the dogs and that the officers only began searching the residence after the two-minute conversation had ended.  At that point, Officer Matthew Bray fired six bullets at Blanca and Junior, killing the dogs as they stood behind the wooden barricade in the kitchen.

The officers agree that Bray killed Blanca and Junior in the kitchen with six bullets, but the officers dispute Castro's account of what happened prior to the killings.  After Castro and Chris Bullman moved to the ground, Officer Bray testified that he heard Castro yell only once for the police officers to refrain from killing the dogs before Bray shot them  Officer Hurd similarly remembered hearing Castro yelling once to save the dogs, though he conceded that it was possible that Castro had made the statement three or four times without his hearing.  The officers testified

that the dogs were behaving in a threatening way, which allegedly necessitated the killings. According to Officer Bray, both Blanca and Junior were "[t]rying to jump the wooden barricade that separated the kitchen from the living room" before he shot them. Their behavior was vicious enough that Officer Bray claimed that he was "virtually certain the first thing they would've done is bite [him]" if they had succeeded in jumping over the barricade. Similarly, Sergeant Severy testified that Blanca and Junior "were barking and growling." Officer Hurd claimed that he believed the officers were "in immediate danger of being attacked by" the dogs, who "easily had the capability to hop th[e] plywood and put all the officers . . . in danger."

After Officer Bray shot Blanca and Junior, the officers cleared Castro's house, seizing 26 or 27 marijuana plants and $4,683.00 in cash. Castro also claimed that the officers disabled and damaged his surveillance cameras. The officers denied having knowledge of such an act. Although Castro's surveillance system picked up footage of what took place outside of the house, "there was no live video from inside the house." The last part of the house that the officers cleared was the bedroom in which Castro had placed Yayo. Before searching the bedroom, Sergeant Severy permitted Castro to move Yayo to the bathroom, where the dog survived the raid.

While the raid was happening, Chris Bullman's cousin, Alonzo Bullman, drove to Castro's home with the intent of picking up Chris. Alonzo Bullman "was confused and concerned" at the sight of the narcotics raid, "so he decided to circle the block a few times" and call Chris's brother to find out what was happening. The officers noticed Alonzo Bullman circling the block while talking on his cell phone and claimed that they became concerned about a potential threat to their safety. According to Officer Hurd, Alonzo Bullman's behavior "raised suspicion[s] . . . that he could possibly be attempting to ambush us." Sergeant Severy testified that he "had instances in the past where at search warrants people have approached the location intending to harm

[the police officers]." Officers Bray and Hurd stopped Bullman, and Officer Hurd testified that he smelled marijuana "com[ing] up from [Bullman's] vehicle" as he approached. The officers asked Bullman to step out of the vehicle, at which point Officer Bray "patted [Bullman] down, searched his pockets and then put him in handcuffs." Officer Hurd searched Bullman's vehicle but discovered no contraband, after which Bullman was released.

Castro was subsequently charged with possession of a controlled substance with the intent to distribute or manufacture. Castro filed a motion to dismiss the criminal case, based on Castro's status as a licensed medical marijuana caregiver under the Michigan Medical Marihuana Act. After determining that Castro had complied with the Act, the Wayne County Circuit Court granted Castro's motion to dismiss.

Alonzo Bullman subsequently filed a lawsuit against the City of Detroit and two Detroit police officers. Bullman later filed an amended complaint, naming Castro and Motyka as additional plaintiffs and suing the City of Detroit, along with eight Detroit police officers in their individual and official capacities. The Amended Complaint alleged the following: violations of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983 against the individual officers and the City of Detroit; respondent superior liability against the City of Detroit; municipal liability against the City of Detroit for the failure to train, supervise, and control its officers; violations of the Michigan Constitution against the officers who stopped Alonzo Bullman; conversion for the property and money that the officers seized at Castro's residence; and the intentional infliction of emotional distress.

For purposes of this appeal, the following allegations in the Amended Complaint are relevant. First, Bullman alleged that the police officers did not have reasonable suspicion to stop him. Second, Bullman alleged that the officers did not have probable cause to search his car.

Third, Castro and Motyka alleged that Officer Bray's killing of Blanca and Junior constituted an unreasonable seizure. The plaintiffs claimed that each of these allegations violated the Fourth Amendment and 42 U.S.C. § 1983. With respect to the allegedly unreasonable seizures of Blanca and Junior, the Amended Complaint asserted that Officer Bray violated the Fourth Amendment interests of both Castro and Motyka by shooting the two dogs. However, the district court's order treated Castro's Fourth Amendment interests as being implicated by the killing of Junior (the licensed pit bull registered to Castro), and it treated Motyka's Fourth Amendment interests as being implicated by the killing of Blanca (the pit bull with an expired license and registration in Motyka's name). Motyka and Castro do not challenge this on appeal.

The defendants filed a joint motion for summary judgment, making the following key arguments: (1) the traffic stop of Alonzo Bullman was reasonable, given that the officers had reasonable suspicion to stop his car; (2) the search of Alonzo Bullman's car was reasonable because the officers had probable cause to search it once they smelled marijuana; (3) Blanca and Junior posed an imminent threat to the safety of the police officers during the narcotics raid, making their seizure reasonable under the Fourth Amendment; and (4) regardless of whether the dogs posed an imminent threat, the seizure of the unlicensed pit bull Blanca was reasonable because unlicensed dogs are contraband under Michigan law.

The district court partially granted and partially denied the defendants' joint motion for summary judgment on February 28, 2018. The district court granted summary judgment for defendants on the following counts: the federal and state law claims against the city of Detroit; the alleged intentional infliction of emotional distress; and the alleged conversion of the seized marijuana, cash, and dogs during the raid. However, the district court denied summary judgment for the defendants on three claims. First, the district court denied qualified immunity with respect

to Alonzo Bullman's Fourth Amendment claim against Officers Bray and Hurd for the traffic stop. The district court stated that "the Fourth Amendment right to be free from an unreasonable seizure is a clearly established right," and it determined that Officers Bray and Hurd violated that right by stopping Alonzo Bullman based on a "vague, generalized fear" of ambush that fell short of reasonable suspicion.

Second, the district court denied qualified immunity to Officers Bray and Hurd for the search of Alonzo Bullman's car. The court determined that the officers lacked reasonable suspicion to stop Bullman in the first place. The search resulted from the original stop. Because the officers lacked reasonable suspicion, they did not have probable cause to search Bullman's vehicle, rendering the search unreasonable. The court did not address whether, if the stop was valid, there was probable cause to search the car.

Third, the district court denied qualified immunity with respect to the Fourth Amendment claims for killing Blanca and the licensed dog, Junior. Viewing the facts in the light most favorable to the plaintiffs, the district court concluded that "the dogs did not pose an imminent threat to officer safety," "given that the dogs were separated from the officers and never lunged at or attacked the officers." As a result, "seizing the dogs by killing them was unreasonable" under the Fourth Amendment. The district court also rejected an alternative argument for qualified immunity with respect to Motyka's Fourth Amendment claim against Officer Bray for killing the unlicensed pit bull, Blanca. Officer Bray had argued that it was reasonable for him to kill Blanca under the Fourth Amendment because unlicensed dogs are contraband under Michigan law. The district court disagreed. It determined that Motyka "retained a constitutionally protected property interest in Blanca," irrespective of the fact that Blanca's license and registration had expired.

Officers Bray and Hurd now appeal the district court's denial of qualified immunity on each of these three claims.

**II**

We have jurisdiction over the district court's denial of qualified immunity to Officers Bray and Hurd under 28 U.S.C. § 1291, which confers appellate jurisdiction over challenges to "final decisions." "An order denying qualified immunity is a[n appealable] collateral order" under 28 U.S.C. § 1291 "because it is conclusive, separable from the merits of the action, and . . . is effectively unreviewable on appeal from a final judgment." *Brown v. Chapman*, 814 F.3d 436, 443 (6th Cir. 2016); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526–29 (1985).

Our appellate jurisdiction is limited to the review of the district court's legal determinations. *Brown*, 814 F.3d at 444. We "may decide an appeal challenging the district court's *legal* determination that the defendant's actions violated a constitutional right or that the right was clearly established," just as we may "decide an appeal challenging a *legal* aspect of the district court's factual determinations." *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015). However, we do not have appellate jurisdiction to review fact-based questions, such as "question[s] of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." *Johnson v. Jones*, 515 U.S. 304, 313 (1995). In light of this limitation, appellate courts must "'take, as given, the facts that the district court assumed when it denied summary judgment,' and, when that is unclear, [they must] 'determine what facts the district court . . . likely assumed.'" *Romo v. Largen*, 723 F.3d 670, 675 (6th Cir. 2013) (quoting *Johnson*, 515 U.S. at 319).

Qualified immunity was warranted for the traffic stop of Bullman, because reasonable officers could disagree about whether Officers Bray and Hurd had reasonable suspicion for the

stop. However, qualified immunity was not warranted for the search of Bullman's car and for the shootings of Blanca and Junior.

## A

Taking the facts assumed by the district court as given, *see Romo*, 723 F.3d at 675, the district court erred in its legal determination that Officers Bray and Hurd lacked reasonable suspicion under the Fourth Amendment and 42 U.S.C. § 1983 for the stop of Bullman. Qualified immunity is warranted on this claim because the police officers could reasonably determine that they had a sufficient basis for the stop of Bullman. If a reasonable official in the position of the police officers could conclude that the officers' conduct was lawful, then qualified immunity is warranted. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). That standard is satisfied here. The officers stopped Bullman after observing him circle the block of Castro's residence multiple times while talking on a cell phone during the active narcotics raid. For a stop to be lawful under the Fourth Amendment, police officers must have "reasonable suspicion" of criminal activity. *Houston v. Clark Cty. Sherriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999). This extends to a "reasonable suspicion to believe that that criminal activity 'may be afoot,' *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)), and to a "manifestation that the person stopped is, or is about to be, engaged in criminal activity," *id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Reasonable suspicion is not an "onerous" standard, *Houston*, 174 F.3d at 813, and requires courts to "look to the 'totality of the circumstances' . . . to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing," *Arvizu*, 534 U.S. at 273. Circling a block three times while talking on a cell phone may by itself be innocuous behavior. However, when that behavior occurs next to an active narcotics raid, it raises legitimate concerns about a potential attempt to interfere

with the raid and threaten officer safety. At the time of the raid, the officers had probable cause to believe that Castro was selling drugs from his residence, making concerns about a potential threat from one of Castro's drug-dealing acquaintances plausible. Under these circumstances, a reasonable official in the position of the police officers could have suspected that Bullman was, or was about to be, engaged in criminal behavior. *See al-Kidd*, 563 U.S. at 741.

An additional factor supports the reasonableness of determining that the officers had a sufficient basis for the stop. "The Supreme Court has repeatedly stressed that 'it is unreasonable to prevent the police from taking reasonable steps to protect their safety'" and that police officers are under no obligation to "decide instantaneously what 'less intrusive' alternative exists to ensure that any threat . . . will be neutralized." *United States v. Foster*, 376 F.3d 577, 587 (6th Cir. 2004) (quoting *Michigan v. Long*, 463 U.S. 1032, 1052 n.16 (1983)). That concern is applicable in this case: the officers testified that they stopped Bullman because of their concerns about a possible "ambush." In assessing potential threats to their safety, the totality-of-the-circumstances approach "allows officers to draw on their own experience and specialized training" to determine whether behavior is suspicious enough to warrant a stop. *Arvizu*, 534 U.S. at 273. One officer, Sergeant Severy, testified that he had witnessed "instances in the past where at [the site of police raids] people have approached the location intending to harm" officers. While Sergeant Severy was not personally responsible for stopping Bullman, his testimony supports the conclusion that a reasonable official in the position of the officers could have had legitimate concerns that Bullman posed a potential threat to the officers' safety, such that qualified immunity was warranted. *See al-Kidd*, 563 U.S. at 741.

Several cases cited by the plaintiffs in this connection are materially different. In *United States v. Montgomery*, 561 F.2d 875 (D.C. Cir. 1977), the suspect was not in the vicinity of a

narcotics raid or crime-ridden area, and the officers pulled him over after seeing him merely "watch[ ] them in his rear view mirror and look[ ] around." *Id.* at 879. Although *United States v. Bohman*, 683 F.3d 861 (7th Cir. 2012), and *United States v. Keith*, 559 F.3d 499 (6th Cir. 2009), involved suspicious activity near a location that the police knew to be the site of drug crimes, the officers based the stops on seemingly innocuous activity, such as glancing in the direction of the police officers or simply emerging from the drug location. *Bohman*, 683 F.3d at 865; *Keith*, 559 F.3d at 506. Furthermore, neither of the cases involved an active police raid that would have warranted concerns about an attempt to target the officers. *Bohman*, 683 F.3d at 865; *Keith*, 559 F.3d at 506.

Although the Second Circuit's opinion in *Dancy v. McGinley*, 843 F.3d 93 (2d Cir. 2016), is closer, it is alone not sufficient to clearly establish that the stop in the instant case lacked reasonable suspicion. In *Dancy*, police officers pulled over a suspect who had been "looking over [his] shoulders at the police" while walking with an individual "who (in some ways) met the description of a robbery suspect" shortly after the robbery occurred and in the vicinity of the crime. *Id.* at 109. The Second Circuit determined that the police officers lacked reasonable suspicion to stop the suspect, in part because "there is nothing suspicious about looking over one's shoulder at an approaching police car." *Id.* at 110. *Dancy* is distinguishable from Bullman's stop. Bullman was behaving suspiciously near an active narcotics raid, whereas the suspect in *Dancy* "was walking with a thin, black male in downtown Poughkeepsie on a Friday evening, in proximity of a crime scene, nothing more." *Id.* Moreover, even if *Dancy* provides some support for Bullman's argument, it does not clearly establish that Bullman's stop was unconstitutional. "Government officials who perform discretionary functions are generally entitled to qualified immunity and are protected from civil damages so long as 'their conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known.'" *Pray v. City of Sandusky*, 49 F.3d 1154, 1157 (6th Cir. 1995) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To justify a denial of qualified immunity, the alleged constitutional violation must be so clear that "every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Bullman has not shown that his stop was so clearly unconstitutional as to satisfy that standard, given the legitimate reasons for thinking that Bullman could have posed a threat to the officers conducting the narcotics raid.

In short, qualified immunity was warranted for the stop.

**B**

Given the analysis above, the district court's reliance on the unreasonableness of the stop of Bullman as the basis for denying qualified immunity to the officers for the search of Bullman's car is not legally sufficient. However, qualified immunity for the search of Bullman's car was properly denied because there was a genuine issue of material fact as to whether the officers smelled marijuana in Bullman's car.

The officers' stated reason for conducting the search—that they smelled marijuana emanating from Bullman's car—does not provide a sufficient basis for granting qualified immunity. It is true that "an officers' detection of the smell of marijuana in an automobile can by itself establish probable cause for a search." *United States v. Johnson*, 707 F.3d 655, 658 (6th Cir. 2013); *see also United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004); *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993). However, the fact that the officers did not discover any marijuana in Bullman's car raises a question about the credibility of the officers' account that should be decided by a jury. We came to a similar conclusion in *Green v. Throckmorton*, 681 F.3d

853 (6th Cir. 2012), a case that dealt with a police officer who claimed to have reasonable suspicion to perform a series of field sobriety tests on a suspect based on his observations about the suspect's constricted pupils. *Id.* at 862–63. Subsequent tests for drugs and alcohol "showed that the driver was in fact sober," and we reversed the district court's grant of qualified immunity to the officer because "[t]hat evidence alone is sufficient to cast doubt on the truthfulness of [the police officer]'s testimony regarding [the suspect]'s pupils." *Id.*; *see also Miller v. Sanilac Cty.*, 606 F.3d 240, 248–49 (6th Cir. 2010).

Although the district court did not address the issue of whether the officers smelled marijuana, that does not preclude us from relying on it for the purposes of determining whether qualified immunity was warranted for the search of Bullman's car. A review of the record indicates that the district court would have likely found there to be a genuine issue as to whether Officers Bray and Hurd smelled marijuana. *See Johnson*, 515 U.S. at 319. Both Officer Hurd and Officer Bray testified that they smelled marijuana when they approached Bullman's car. In contrast, Bullman stated in an affidavit that "[a]t no point in time has my vehicle ever smelled of marijuana." Bullman speculated that the police officers might have smelled marijuana from the narcotics raid, given that he "observed police officers removing several marijuana plants" from Castro's home at the time of his stop. *Id.* The results of the car search support Bullman's account, since the police officers did not discover any contraband in Bullman's car. In light of the conflicting evidence in the record, the district court would likely have assumed for summary judgment purposes that the officers did not smell marijuana in Bullman's car. *See Johnson*, 515 U.S. at 319.

Qualified immunity was accordingly properly denied on the automobile search claim.

**C**

Officer Bray offers two alternative grounds for granting qualified immunity for the shootings of the pit bulls. Neither ground is sufficient. First, taking the facts assumed by the district court as given, the pit bulls did not pose an imminent threat to the officers as a matter of law. Second, there is no evidence in the record indicating that Officer Bray knew that one of the pit bulls was unlicensed at the time of the shooting; therefore, the dog's unlicensed status does not make the shooting reasonable under the Fourth Amendment.

**1**

To the extent that Officer Bray challenges the district court's factual determination that the pit bulls were not acting aggressively at the time of the narcotics raid, his arguments are beyond the scope of our appellate jurisdiction. *See Johnson*, 515 U.S. at 313. However, we do have appellate jurisdiction over the question of whether, taking the facts assumed by the district court as given, the pit bulls posed an imminent threat to the officers as a matter of law. *See Brown*, 814 F.3d at 444. Our appellate jurisdiction is not undermined by the relatedness of the two issues. Rather, "[w]hen legal and factual issues are confused or entwined, 'we must separate an appealed order's reviewable determination . . . from its unreviewable determination'" and issue a decision on the reviewable determination. *Thompson v. City of Lebanon*, 831 F.3d 366, 370 (6th Cir. 2016) (quoting *Robertson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014)).

Taking the facts assumed by the district court as given, Officer Bray's shootings of Blanca and Junior were not reasonable under the Fourth Amendment, and thus did not warrant qualified immunity. Shooting a dog is reasonable when, "given all of the circumstances and viewed from the perspective of a reasonable officer at the scene, the [dogs] posed imminent threats to the officers." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 568 (6th Cir. 2016). An imminent

threat is "'[a]n immediate, real threat to one's safety that justifies the use of force in self-defense,' or '[t]he danger resulting from an immediate threatened injury sufficient to cause a reasonable and prudent person to defend himself or herself.'" *Id.* at 567. Although *Brown* was decided after the narcotics raid at Castro's home took place, the *Brown* panel determined that it was clearly established as of 2013 that "unreasonably shooting [the] dogs [of the target of a narcotics raid] would constitute the 'seizure' of an 'effect' within the meaning of the Fourth Amendment." *Id.* at 566.

The circumstances of this case are not similar enough to those in *Brown* to warrant determining that the pit bulls posed an imminent threat as a matter of law. According to the district court, "[v]iewing the facts in the light most favorable to [Castro and Motyka], a jury could reasonably conclude that . . . the dogs were separated from the officers and never lunged at or attacked the officers," and that the dogs were rather "cowering in the corner" when the raid began. If true, such behavior would not have constituted an "imminent threat" to officer safety, thereby making the shootings unreasonable under the Fourth Amendment. *See Brown*, 844 F.3d at 567.

A comparison of the factual circumstances in this case and of those in *Brown* supports this determination. First, Blanca and Junior were separated from the officers by a wooden barricade, whereas the pit bulls in *Brown* were loose in the home that the officers needed to clear. *Id.* at 563. Second, the target of the narcotics raid in *Brown* was known to police officers for his "criminal history, known gang affiliations, possession and use of firearms, and possible possession of cocaine and heroin." *Id.* at 561. Here, the officers targeted Castro's house because they believed he was involved in narcotics trafficking, without evidence of additional criminal activity. Third, although the dog owner in *Brown* testified that his dogs were not behaving aggressively at the time of the raid, the owner was outside of the residence when the officers entered and shot the dogs. As

a result, the testimony was insufficient to create a genuine issue of material fact as to the dogs' aggressiveness. *Id.* at 571–72. In contrast, Castro testified about the dogs' behavior based on his vantage point from inside the home, and he denied that Blanca and Junior were "attacking or being vicious in any way." This is similar to the dog owner's testimony in *Robinson v. Pezzat*, 818 F.3d 1 (D.C. Circ. 2016), a case in which the D.C. Circuit denied qualified immunity to police officers for shooting dogs during a raid when there was a genuine dispute about the aggressiveness of the dogs' behavior. *Id.* at 4.

Accordingly, taking the facts assumed by the district court as given, the pit bulls did not pose an imminent threat to the officers, and qualified immunity for the shooting of the pit bulls was not warranted on this ground.

**2**

Officer Bray is not entitled to qualified immunity for the shooting of Blanca, the unlicensed pit bull, on the alternative theory that Blanca's unlicensed status made the shooting reasonable under the Fourth Amendment.

Officer Bray argues that his killing of Blanca was reasonable because she was unlicensed and therefore "contraband" under the Fourth Amendment. We rejected that same argument in *Smith v. City of Detroit, Michigan*, 751 F. App'x 691, 697 (6th Cir. 2018), but we need not reach it here because there is no evidence that Officer Bray had probable cause to believe Blanca was unlicensed at the time of the shooting. For a seizure of property to be reasonable under the Fourth Amendment, "the item [must, among other things,] be in plain view," with its "incriminating nature [being] 'immediately apparent'" to the officer at the time of the seizure. *Horton v. California*, 496 U.S. 128, 136 (1990) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)); *see also Arizona v. Hicks*, 480 U.S. 321, 326 (1987). The "incriminating nature" of a

piece of property is only "immediately apparent" when a police officer has probable cause to believe that the property may be "evidence of a crime." *Hicks*, 480 U.S. at 326; *see also Horton*, 496 U.S. at 136. Officer Bray does not argue that he knew Blanca was unlicensed at the time of the shooting, and his counsel conceded at oral argument that there is no evidence he had such knowledge. Even if we assume Officer Bray's theory that unlicensed dogs are contraband under Michigan law, denial of qualified immunity would still be proper because he did not know she was unlicensed when he killed her. *See Smith*, 751 F. App'x at 697 (finding dogs' unlicensed status was irrelevant in part because "it [was] not [] immediately apparent to the police officers that the dogs needed to be licensed and were not").

### III

Accordingly, we reverse the district court's denial of qualified immunity to Officers Bray and Hurd for the stop of Bullman, and affirm the district court's denial of qualified immunity with respect to the other claims.