RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0293p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MARK BROWN; CHERYL BROWN,

　　　　　　　　　　*Plaintiffs-Appellants,*

　　*v.*

BATTLE CREEK POLICE DEPARTMENT, et al.,

　　　　　　　　　　*Defendants,*

JEFFREY CASE; CITY OF BATTLE CREEK; CHRISTOF KLEIN, DAMON YOUNG,

　　　　　　　　　　*Defendants-Appellees.*

No. 16-1575

———————————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:15-cv-00283—Robert J. Jonker, Chief District Judge.

Argued: December 1, 2016

Decided and Filed: December 19, 2016

Before: MOORE and CLAY, Circuit Judges; HOOD, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Brian T. Keck, MORGAN & MEYERS, PLC, Dearborn, Michigan, for Appellants. Saura J. Sahu, CITY ATTORNEY'S OFFICE, Battle Creek, Michigan, for Appellees. **ON BRIEF:** Brian T. Keck, Courtney E. Morgan, Jr., MORGAN & MEYERS, PLC, Dearborn, Michigan, for Appellants. Saura J. Sahu, CITY ATTORNEY'S OFFICE, Battle Creek, Michigan, for Appellees.

———————————

[*]The Honorable Joseph M. Hood, Senior District Judge of the United States District Court for the Eastern District of Kentucky, sitting by designation.

---

**OPINION**

---

CLAY, Circuit Judge.  In this 42 U.S.C. § 1983 action, Plaintiffs Mark Brown and Cheryl Brown (collectively, "Plaintiffs") seek to hold Officers Christof Klein, Damon Young, and Jeffrey Case (collectively, "Individual Officers" or "officers") of the City of Battle Creek Police Department ("BCPD") and the City of Battle Creek ("City") (collectively, "Defendants") liable for unlawfully seizing their property in violation of the Fourth Amendment when the officers shot and killed their two dogs while executing a search warrant.  The district court granted Defendants' motion for summary judgment and entered judgment in favor of Defendants. Plaintiffs appeal the judgment.

For the reasons set forth in this opinion, we **AFFIRM** the district court's judgment.

I.     **STATEMENT OF FACTS**

A.  **Factual Background**

i.  **Trash Pull, Warrant, and Briefing Prior to Raid**

On April 16, 2013, the BCPD conducted a trash pull at the residence of Danielle Nesbitt ("residence").  The trash pull recovered baggies with residue of marijuana and cocaine, a small amount of loose marijuana, and mail addressed to Plaintiffs and Vincent Jones, the father of Ms. Nesbitt's child.

On April 17, 2013, the BCPD obtained a warrant to search the residence.  The evidence recovered from the trash pull and information from a confidential informant were the bases for the search warrant.  The affiant stated that he had received information indicating that Vincent Jones lived at the residence and was distributing controlled substances from inside the residence. Ms. Nesbitt, the daughter of Cheryl Brown, owned the home and allowed her mother and Mark Brown to stay in the basement of the residence.

That same day, the officers executed the search warrant.  Prior to execution of the warrant, the officers and members of the City's Emergency Response Team ("ERT") met to

discuss the details related to the case, including Jones' criminal history, Jones' known gang affiliations and gang associates, whether there were children or dogs present at the residence, and any other issues or concerns they may have had prior to the search. Defendants decided to involve the ERT for this search because of the threat the subject, Vincent Jones, posed given his criminal history, known gang affiliations, possession and use of firearms, and possible possession of cocaine and heroin he was alleged to be distributing out of the residence. Officer Case testified that Vincent Jones was a member of the north side gang in Battle Creek, and that this gang was one of the reasons why the BCPD created the gang unit. He stated that "Vincent Jones, many of [the officers] kn[e]w him very, very well, his gang history, his drug history, his gun history, the foot chases, the car chases, the shootings. He [was] a bad guy. Very rarely [wa]s he alone." (R. 61-5, Officer Jeffrey Case Dep., PageID# 53−54.)

Officer Case went on to state that "Vincent Jones was a primary target when the gang unit started because of many of the activities that we're talking about, and that gang . . . was fairly large, very tight. Many of them carried guns, shot people, sold drugs. So any time Vincent was associated with something, it was highly likely that there would be others involved or close." (*Id*. at 54−55.) He then testified that, "whether [Vincent Jones] got stopped or not, the risk [that others were in the residence] would still be high." (*Id*. at 55−56.) The officers were informed during the briefing that Vincent Jones had just been released from prison after maxing out his time at state prison a month prior to the raid. During the briefing, the officers and ERT had no information about whether there were dogs in the residence.

After the briefing, the officers and the ERT headed to the residence. On the way to the residence, the officers, including Officers Klein and Young, received information that Vincent Jones had left the residence and had been detained by police with heroin on his person. They were also informed that there was a dog in the backyard and another subject in the residence, later identified as Mark Brown. Mark Brown testified that he came to the residence during his lunch break that day to let the dogs out around 1:00 p.m., and was on his way out of the residence around 2:00 p.m. to go back to work when he was detained by Officer Sutherland.

Mark Brown was walking on the front lawn of the residence toward his car, which was parked on the street, when Officer Sutherland pulled up behind Mark Brown's car. Officer

Sutherland placed Mark Brown in handcuffs and informed him that officers would soon be executing a search warrant for the residence. Mark Brown was standing behind his car with a view of the residence's front door and front window.

A few minutes after Mark Brown was detained, the officers, including Officers Case, Klein, and Young, and the ERT pulled up to the residence. Officers Klein and Case testified that this was when they first saw the "Beware of Dog" sign outside the residence. (Case Dep. at 44; R. 61-2, Officer Christof Klein Dep., PageID# 104.) The officers, with the exception of Officer Case, proceeded directly to the front door. Mark Brown testified that when the officers and ERT arrived, he told Officer Sutherland that he had a key to the front door, that there was no one else in the residence, and that his two dogs were in the residence. Officer Sutherland tried telling the officers this information before they breached the front door. Officer Klein testified that he did not hear about Mark Brown's comments to Officer Sutherland prior to breaching the front door.

### ii. Execution of the Search Warrant

### 1. Forced Entry Through Front Door

Officer Klein led the group of officers and ERT to the front door, where he saw two dogs through the front window standing on a couch. Officer Klein testified that as the officers approached the front door, he could see the dogs barking aggressively, "digging and pawing," and "jumping" at the window. (Klein Dep. at 79.) The first dog was a large, brown pit bull, weighing about 97 pounds, and the second dog was a smaller white pit bull, weighing about 53 pounds. Officer Klein knocked on the front door, announced their presence, and "less than fifteen seconds" later, breached the door with a ram, which is a large metal object used by law enforcement to open doors. (Klein Dep. at 70−71.) After the door was breached, Officer Klein was the first of the search warrant team to enter the residence.

Mark Brown testified that he was able to see the two dogs in the window standing on the couch before the door was breached. Mark Brown testified that, as the officers were approaching the residence, the dogs were not barking. Mark Brown also stated that the second dog did not bark at all, and that he had the second dog almost a year at that point and "she [had] never barked a day in her life." (R. 61-8, Mark Brown Dep., PageID# 54.)

## 2. Entryway and Kitchen Sweep

Officer Klein testified that when he entered the house, the first dog jumped off the couch, was aggressively barking at the officers, and lunged at him. He also noted that when the officers entered the residence, the second pit bull jumped off the couch, went through the kitchen and down into the basement. He further testified that when the first pit bull lunged at him in the entryway, he fired his first shot. Officer Klein explained that the first pit bull "had only moved a few inches" between the time when he entered the residence and when he shot her, and that this movement was what he considered to be a "lunge." (*See* Klein Dep. at 73−75, 77.) Klein testified that he "hit" the first dog with a non-lethal shot, but that he was "aiming at its head." (*Id*. at 80.)

## 3. Basement Sweep

Officer Klein stated that after he struck the first pit bull in the entryway, the dog moved away from the officers and towards the kitchen, then down the stairs and into the basement. Officer Klein noted that this first dog was not running, as it "look[ed]" injured. (*Id*. at 82.) As the officers were descending the stairs to clear the basement, they noted that the first pit bull was at the bottom of the stairs. Klein testified that the first pit bull obstructed the path to the basement, and that he "did not feel [the officers] could safely clear the basement with those dogs down there." (*Id*. at 95−96.) The officers' "priority w[as] [ ] to secure the basement if there w[ere] any people down there." (*Id*. at 97.) When the officers were halfway down the stairs, the first dog, who was at the bottom of the staircase, turned towards them and started barking again. From the staircase, Officer Klein fired two fatal rounds at the first pit bull. (*Id*.)

When the officers got down to the basement, they noted that the "basement was loaded. You've gotta look under beds, you've gotta do everything, and [the dogs] basically prevented us from doing that, and they were protecting that basement." (Case Dep. at 86.)

Officer Klein testified that after he shot and killed the first dog, he noticed the second dog standing about halfway across the basement. The second dog was not moving towards the officers when they discovered her in the basement, but rather she was "just standing there,"

barking and was turned sideways to the officers.  (Klein Dep. at 87.)  Klein then fired the first two rounds at the second dog.

After being shot by Officer Klein, the second dog ran to the back corner of the basement. The second pit bull was in this corner when Officer Young, who was also clearing the basement, shot her because she was "moving" out of the corner and in his direction.  (*Id*. at 92.)  After being shot by Officers Klein and Young, the second pit bull ran to the back of the furnace in the back corner of the basement.  Officer Case saw that "[t]here was blood coming out of numerous holes in the dog, and . . . [Officer Case] didn't want to see it suffer" so he put her out of her misery and fired the last shot.  (*Id*. at 93−94; Case Dep. at 79.)

### iii.  City of Battle Creek Police Department's Relevant Policy

The BCPD has the following policies with regard to the use of firearms when responding to resistance in various law enforcement situations:

> It is the policy of the Battle Creek Police Department that officers may use response to resistance when the officer reasonably believes that the action is in defense of human life, including the officers own life, or in defense of any person in imminent danger or serious physical injury.

> Justification for the use of response to resistance is to be limited to what reasonably appears to be the facts known or perceived by an officer at the time he/she decides to use response to resistance. . . . The authority to use this force carries with it the responsibility that only the level of force necessary to accomplish lawful objectives is used.

> Dangerous Animal, defined:  An animal that bites or attacks a person or another animal.

> **Vicious Dog, defined:**  An animal of the Canis familaris species which, when either unmuzzled or unleashed, or when not confined to the premises of the owner, menaces a person in a manner which an ordinary and reasonable person would conclude to be an apparent attitude of attack.

(R. 61-3, Policy on Response to Resistance and Firearms, PageID# 1−2.)

**B. Procedural History**

On March 17, 2015, Plaintiffs filed the action against Defendants, claiming violations of their constitutional rights pursuant to 42 U.S.C. § 1983. Specifically, Plaintiffs alleged Defendants violated their Fourth Amendment right to be free from unreasonable search and seizure when the officers unconstitutionally seized their dogs and unreasonably forced entry into the residence. Plaintiffs also alleged that the City was municipally liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) because the BCPD failed to provide training to address the known risk of constitutional violations arising from dog shootings.

On January 26, 2016, Defendants moved the district court for summary judgment on the basis that there was no genuine dispute of a material fact as to any of Plaintiffs' claims. Defendants argued that the officers were protected by the doctrine of qualified immunity, and in any event, the seizure of the dogs was reasonable. Next, Defendants argued that Plaintiffs failed to make a proper showing under *Monell*, and that the damage to the front door was reasonable given the circumstances of the search. On January 5, 2016, Plaintiffs responded, arguing that they have a constitutional right to be free from unreasonable seizure of their dogs and from unreasonable destruction of the residence's front door, and that the officers' seizure and destruction in this case were unreasonable.

On March 28, 2016, the district court heard oral argument on the motion and orally granted the motion in favor of Defendants on all of Plaintiffs' remaining claims. The district court held that Plaintiffs presented no evidence creating a genuine issue of material fact as to their Fourth Amendment claims of unreasonable seizure of their two dogs and the front door. The district court also held that Plaintiffs failed to provide evidence that the City's inadequate training policy was the cause of the alleged constitutional violations in this case. On March 29, 2016, the district court entered judgment in favor of Defendants.

## II.   DISCUSSION

### A.  Qualified Immunity

Plaintiffs argue on appeal that the district court erred in granting the officers qualified immunity and determining that the officers' seizure of Plaintiffs' dogs was reasonable. Specifically, Plaintiffs contend that:  (1) it is clearly established that a government official's unreasonable killing of a dog is a seizure under the Fourth Amendment; and (2) the seizure of the dogs was unreasonable.

Conversely, Defendants argue that the district court correctly concluded that the officers are immune from this action under the qualified immunity doctrine and that, in any event, they did not violate a clearly established right pursuant to the Fourth Amendment.  Specifically, Defendants assert that:  (1) Plaintiffs have no constitutional right to be free from the unreasonable seizure of a dog because this Circuit and the Supreme Court of the United States have not held that such a right exists; and (2) if the Court determines that Plaintiffs have this right, then the officers did not violate this right because the shootings were reasonable inasmuch as the Court's review of the excessive force claim is limited to the moments preceding the shootings.

We find that the district court did not err in granting summary judgment to the officers on their qualified immunity claim given Plaintiffs' failure to show the existence of a genuine issue of material fact as to the reasonableness of the seizures.

### i.  Standard of Review

A district court's grant of summary judgment is reviewed *de novo*.  *Mullins v. Cyranek*, 805 F.3d 760, 764 (6th Cir. 2015) (citation omitted).  "Summary judgment is appropriate where the evidence in the record, viewed in its entirety, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Id.* at 764−65.  This Court "must assume the truth of the non-moving party's evidence and construe all inferences from that evidence in the light most favorable to the non-moving party."  *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006) (citation omitted).  Such a genuine issue of material

fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party. *Id*. Furthermore, a "mere scintilla" of evidence will not be enough for Plaintiffs to withstand summary judgment. *Id*. (citation omitted).

### ii. Relevant Legal Principles

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity provides government officials "breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (internal citations and quotation marks omitted). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted).

To determine whether a police officer is entitled to qualified immunity, this Court applies a two-prong test: "(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Mullins*, 805 F.3d at 765 (citation omitted).

### iii. Analysis

#### 1. Violation of a Constitutional Right

The threshold issue this Court must determine is whether the killing of a dog constitutes a "seizure" within the meaning of the Fourth Amendment. In line with every other circuit that has addressed this issue, we hold that a dog is property, and the unreasonable seizure of that property is a violation of the Fourth Amendment.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). As the Ninth Circuit reasoned, "[t]he emotional attachment to a family's dog is not comparable to a possessory interest in furniture." *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005) ("*Hells Angels*").

A large number of this Court's sister circuits have already concluded that, "'the use of deadly force against a household pet is reasonable only if the pet poses an [imminent] danger and the use of force is unavoidable.'" *Robinson v. Pezzat*, 818 F.3d 1, 7 (D.C. Cir. 2016) (quoting *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (holding that the unreasonable killing of a companion dog constitutes a seizure under the Fourth Amendment). *See also Mayfield v. Bethards*, 826 F.3d 1252, 1256 (10th Cir. 2016) (holding that killing a dog constitutes a violation of the dog owner's Fourth Amendment rights absent a warrant or some exception to the warrant requirement); *Carroll v. Cty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) (holding that the unreasonable killing of a companion animal constitutes an unconstitutional seizure of personal property under the Fourth Amendment); *Hells Angels*, 402 F.3d at 975−78 (holding that the killing of guard dogs was unreasonable under the Fourth Amendment where "the officers were not presented with exigent circumstances that necessitated killing the dogs"); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211 (3d Cir. 2001) (same); *cf. Altman v. City of High Point*, 330 F.3d 194, 204−05 (4th Cir. 2003) (holding that privately owned dogs were effects subject to the protections of the Fourth Amendment but officers' actions of shooting and killing the dog were objectively reasonable).

Based on the precedent set forth by a large number of this Court's sister circuits, we hold that as a matter of first impression there is a constitutional right under the Fourth Amendment to not have one's dog unreasonably seized.

### 2. Clearly Established Right in 2013

As to Defendants' argument that it was not clearly established in 2013 that the seizure of a dog was a Fourth Amendment event, we hold that Defendants had reasonable notice that unreasonably shooting Plaintiffs' dogs would constitute the "seizure" of an "effect" within the meaning of the Fourth Amendment. *See also Viilo*, 547 F.3d at 710 (holding that this right was clearly established in 2004 since the Third Circuit decided *Brown* in 2001 and the Ninth Circuit held in 2005 in *Hells Angels* that this right was established in 1998).

"In inquiring whether a constitutional right is clearly established, we must 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) (quoting *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991)). "[A] right must be specific to the relevant factual context of a cited case and not generalized with respect to the Amendment that is the basis of the claim." *Viilo*, 547 F.3d at 710 (citing *Brosseau v. Haugen*, 543 U.S. 194, 198−99 (2004)). In *Hope v. Pelzer*, 536 U.S. 730 (2002), the Supreme Court recognized that previous cases do not have to be "fundamentally similar" and that government officials can still be on notice "even in novel factual circumstances." 536 U.S. at 740−41.

Every circuit that has considered this issue has concluded that the unreasonable killing of a dog constitutes an unconstitutional "seizure" of personal property under the Fourth Amendment. Likewise, the United States District Court of the Eastern District of Michigan, in an unreported opinion, stated that "the federal courts 'have consistently recognized that a law enforcement officer's killing of a pet dog constitutes a destruction of property and therefore a seizure under the Fourth Amendment.'" *Bateman v. Driggett*, No. 11-13142, 2012 WL 2564839, at *7 (E.D. Mich. July 2, 2012) (quoting *Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 279 (D. Conn. 2005) (citing cases)); *see also Preston v. City of St. Clair Shores, Mich.*, No. 14-12751, 2015 WL 12516687, at *7 (E.D. Mich. Dec. 31, 2015) (same).

The Supreme Court and this Circuit have yet to decide this issue. Nevertheless, given the fact that every sister circuit that has confronted this issue has concluded that an individual has a

property right in their dog, and that a district court within this Circuit has concluded the same, we hold that this right was clearly established in 2013 when the conduct in this action occurred. Therefore, we must next determine whether the seizures of the two dogs in the instant case were reasonable under the Fourth Amendment.

### 3.  Reasonableness of Seizures

"Reasonableness is the touchstone of any seizure under the Fourth Amendment." *Hells Angels*, 402 F.3d at 975.  The District of Columbia Circuit recently stated that, "[a]s in any Fourth Amendment case, '[w]e analyze [the] question [of whether a pet constitutes an imminent threat] from the perspective [ ]of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Robinson*, 818 F.3d at 8 (quoting *Plumhoff v. Rickard*, 572 U.S. —— –, 134 S. Ct. 2012, 2020 (2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989))). "Imminent danger" is defined as "[a]n immediate, real threat to one's safety that justifies the use of force in self-defense," or "[t]he danger resulting from an immediate threatened injury sufficient to cause a reasonable and prudent person to defend himself or herself."[1] *Imminent Danger*, BLACK'S LAW DICTIONARY (10th ed. 2014).

"This analysis allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Robinson*, 818 F.3d at 8 (quoting *Graham*, 490 U.S. at 396−97) (internal quotation marks omitted).  "The task of this [C]ourt is to put itself into the shoes of the officers at the time the actions took place and to ask whether the actions taken by the officers were objectively unreasonable." *Altman*, 330 F.3d at 205.  Thus, the standard we set out today is that a police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety.

---

[1]The BCPD's policy stated that "officers may use response to resistance when the officer reasonably believes that the action is in defense of human life, including the officers own life, or in defense of any person in *imminent danger* or serious physical injury." (R. 61-3 at 1−2 (emphasis added).)

To determine whether the seizures of the two dogs were reasonable, "a court must 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion' and determine whether 'the totality of the circumstances justified [the] particular sort of . . . seizure.'" *Carroll*, 712 F.3d at 651 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8−9 (1985) (internal quotation marks omitted)). Plaintiffs bear the burden of proving that the seizure was unreasonable. *West v. Atkins*, 487 U.S. 42, 48 (1988). A seizure becomes unlawful when it is more intrusive than necessary. *Florida v. Royer*, 460 U.S. 491, 504 (1983).

There is no dispute that the shooting of Plaintiffs' dogs were severe intrusions given the emotional attachment between a dog and an owner. *See Hells Angels*, 402 F.3d at 975. On the other hand, insuring officer safety and preventing the destruction of evidence are particularly important governmental interests that the courts must strive to protect. Therefore, the question before the district court was whether, given all of the circumstances and viewed from the perspective of a reasonable officer at the scene, the two pit bulls posed imminent threats to the officers. Because the City and the officers moved for summary judgment, Plaintiffs must point to admissible evidence that creates a genuine dispute of material fact—"a dispute that would allow 'a reasonable jury [to] return a verdict' in [their] favor—on this precise question." *Robinson*, 818 F.3d at 8 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). We find that Plaintiffs have not pointed to admissible evidence that creates a genuine dispute that would allow a reasonable jury to return a verdict in their favor.

Vincent Jones posed a serious threat to the officers' safety given his criminal history, known gang affiliations, possession and use of firearms, and the fact that he was known to be actively distributing cocaine and heroin from the residence. Given the high-risk nature of the raid and the serious threat posed by Jones, the officers decided to involve the ERT in the raid. About a month prior to the raid, Vincent Jones was released from the Michigan Department of Corrections ("MDOC") after serving his maximum time. The district court noted at the hearing that most prisoners do not serve their maximum time at MDOC, and that this, by itself, was an indication of risk posed by Jones since it implied that Jones had behavior problems at MDOC. Officer Case testified that Vincent Jones was a member of the north side gang in Battle Creek,

and that this gang was one of the reasons why the City's police department created the gang unit. He stated that "Vincent Jones, many of [the officers] kn[e]w him very, very well, his gang history, his drug history, his gun history, the foot chases, the car chases, the shootings. He [was] a bad guy. Very rarely [wa]s he alone." (Case Dep. at 53−54.) Officer Case went on to state that "Vincent Jones was a primary target when the gang unit started . . . and . . . the north side gang . . . was fairly large, very tight. Many of them carried guns, shot people, sold drugs. So any time Vincent was associated with something, it was highly likely that there would be others involved or close." (*Id*. at 54−55.) He then testified that, "whether [Vincent Jones] got stopped or not, the risk [that others were in the residence] would still be high." (*Id*. at 55−56.) The district court reasoned that these facts "bespeak danger and risk." (R. 72, Tr. Hr'g Mot. for Summ. J., PageID# 43.)

Although the officers found out that Jones had been detained as they were en route to the residence, the officers knew that it was highly likely that other members of the gang could be in the residence at the time of the raid, or at least close by. Based on the information above, the officers were on high alert going into the raid that other members of the gang could be in the residence and that they could be armed and dangerous.

As the officers approached the front door, Officer Klein testified that he could see the two pit bulls both barking aggressively, "digging and pawing," and "jumping" at the window. (Klein Dep. at 79.) At his deposition, Officer Klein was asked what were the "aggressive behaviors displayed by the dogs, specifically, that indicated to you that yourself or other members of your ERT group were in immediate danger of harm, serious injury, or death?" (Klein Dep. at 97.) Officer Klein answered that:

> [it was the] [d]eep aggressive barking, consistent barking, not just one or two barks, but steady, aggressive. Lunging towards the windows as we made our approach. The dog moving from the couch directly to the front door after it was breached. The fact that the same dog even after it was shot stood at the bottom of the stairs and turned towards me, continuing to bark aggressively in the same manner, and then the second dog, even after that happened, after firing three rounds at the first dog, the second dog turning, pausing as it was moving across the basement, it stopped and turned and was barking.

(*Id*. at 97−98.)

Likewise, Officer Case testified that, "[a]s soon as the door came open, the amount of time between the door coming open and the shot was extremely small. I can't even tell you how much but, I don't know, maybe a second or less. It was very fast. . . . A door is getting breached, dogs are barking, a ton of crap is going on." (Case Dep. at 68−69.)

Mark Brown testified that, as the officers were approaching the residence, he could see the two dogs standing on the couch looking out the window. (Brown Dep. at 37.) Mark Brown stated that the dogs were not barking as the officers approached the residence. Mark Brown also stated that the smaller pit bull did not bark, and that he had it almost a year at that point and "she [had] never barked a day in her life." (*Id*. at 54.) Mark Brown further testified that, "from the time [the officers] knocked in the door until the time [he] heard the gunshots . . . [was] [t]hree to four minutes. [He] d[id]n't know exactly." (Brown Dep. at 38−39.) The district court concluded that despite the discrepancy between the testimony of Mark Brown and the officers, "[t]here [wa]s nothing on the record that contradict[ed] [Officer Klein's] description of what happened," and that in "taking the facts in the light most favorable to the plaintiff[s] . . . unrebutted facts [ ] happen to favor the other side." (R. 72 at 45.) We agree with the district court and conclude that a thorough review of the record demonstrates that Plaintiffs failed to rebut material facts. The disputes as to the timing of the first shots and the barking of the dogs are immaterial to the issue of whether the officers' use of force was reasonable because the testimony that the dogs threatened the officers' safety was unrebutted.

At the hearing, the district court held that, even if it did take the facts in the light most favorable to Plaintiffs, the unrebutted fact that Officer Klein said the large brown pit bull lunged at him before he shot her would still establish that his actions were reasonable. (R. 72 at 24, 45.) A jury could reasonably conclude that a 97-pound pit bull, barking and lunging at the officers as they breached the entryway, posed a threat to the officers' safety and it was necessary to shoot the dog in order for them to safely sweep the residence and insure that there were no other gang members in the residence and that evidence was not being destroyed.

After Officer Klein shot the first dog, the dog went through the kitchen and into the basement. As the officers were moving down the stairs to clear the basement, they noticed that the wounded dog was at the bottom of the stairs. When the officers were halfway down the

stairs, the first dog turned towards them and started barking again from the bottom of the stairs. Officer Klein reasonably fired two fatal rounds at the pit bull. The officers testified that the basement was filled with various objects and it was difficult to determine if there was anybody in the basement hiding behind one of the large objects. The officers had to sweep the basement, and the wounded animal was preventing them from entering the basement and safely sweeping it. Therefore, the seizure of the first dog was reasonable.

With regard to the second pit bull, the question before the district court was whether Plaintiffs presented a genuine issue of material fact as to whether it posed an imminent threat to the officers' safety. The dog was not present in the entryway and was not standing at the bottom of the basement stairs as the officers descended. The second pit bull was in the basement when they descended the stairs and was barking as the officers were attempting to enter and clear the basement. Officer Klein testified that the dog, a 53-pound unleashed pit bull, was standing in the middle of the basement, barking, when he fired the first two rounds. The officers testified that they were unable to safely clear the basement with both dogs there. Therefore, we find that it was reasonable for Officer Klein to shoot the second dog.

After being shot by Officer Klein, the second dog ran to the back corner of the basement and was in the corner when Officer Young shot her. Officer Young testified that he was unable to clear that corner of the basement with a 53-pound unleashed pit bull moving in his direction. We find that Officer Young's shooting of the second dog was reasonable. Officer Case then fired the fatal shot at the second dog when he found it bleeding profusely behind the furnace. As with Officers Klein and Young, we find Officer Case's actions reasonable.

These specific facts distinguish this case from the Ninth Circuit's decision in *Hells Angels* and from parts of the District of Columbia Circuit's decision in *Robinson*. In *Hells Angels*, the Ninth Circuit found that the killing of the guard dogs was unreasonable, in part, because the officers were put on notice a week in advance of the raid that there were dogs at the place to be searched. Unlike *Hells Angels*, the officers here were informed on the way to the raid that there was at least one dog in the residence. The officers had no meaningful time to formulate a plan on how to deal with the dog. Although here the officers did not have notice, even had they been given more advance notice, it is not clear that they would have been able to

make arrangements for the protection of the dogs. Any such arrangements may have raised suspicion or alerted the criminal suspects that something was amiss. It may have given the suspects an opportunity to depart the premises, destroy evidence, or formulate plans for an attack against the officers. Because of such possibilities, the officers' actions here—in failing to make advance arrangements for the protection of the dogs—were reasonable.

The *Robinson* case is especially illustrative because the District of Columbia Circuit found one officer's actions in shooting a dog reasonable and another officer's actions in shooting that dog unreasonable. In *Robinson*, the police obtained a warrant to search the dog owner's home after her grandson was arrested for possession of marijuana. 818 F.3d at 4. A police squad knocked on the front door and identified themselves. *Id.* The dog owner asked the lead officer if she could put her dog, a thirteen-year-old female pit bull/German shepherd mix, in the bathroom while they executed the warrant. *Id.* The officer allowed her to do this, so the dog owner, with the screen door closed but in view of the officers, put the dog in the bathroom. *Id.* The officers then entered the house and the lead officer yelled to the rest of the squad that there was a dog in the bathroom. *Id.* Pezzat, the officer that first shot the dog, testified that she did not hear such warnings. *Id.*

The dog owner testified that she saw Pezzat shoot the dog while the dog was lying on the floor in the bathroom and not posing a threat to the officers. *Id.* Pezzat stated that she first shot the dog after the dog bit her, right outside the bathroom door. *Id.* at 5. Two other officers testified that they heard barking and saw the dog biting Pezzat right outside the bathroom door prior to Pezzat firing the first shot. *Id.* The district court held that the uncorroborated nature of the dog owner's testimony failed to create a genuine dispute of material fact as to whether the dog posed an imminent threat to the officers such that shooting the dog was reasonable. *Id.* at 8−10. The District of Columbia Circuit found that the district court erred because it made a credibility determination as to the dog owner's uncorroborated testimony. *Id.* at 9. The District of Columbia Circuit held that the discrepancy between the dog owner's version of events and the officers' testimony went directly to whether the dog was an imminent threat to the safety of the officers. *Id.* at 9−10.

Conversely, the District of Columbia Circuit found that Officer McLeod, the second officer to shoot the dog, acted reasonably. *Id*. at 11. There was undisputed evidence that McLeod shot the dog after it bit Pezzat. *Id*. The *Robinson* court held that, "[g]iven that [the dog] bit [ ] Pezzat hard enough to puncture her leather boots, McLeod's belief—just seconds later— that the dog continued to pose an imminent threat even absent additional aggressive behavior was hardly unreasonable." *Id*. at 12.

Similar to the lack of rebuttal evidence presented as to Officer McLeod in *Robinson*, Plaintiffs provided no evidence rebutting the officers' testimony that the first dog lunged at the officers in the entryway, or testimony rebutting the fact that it prevented the officers from entering and sweeping the basement safely. Likewise, Plaintiffs failed to present evidence rebutting that fact that the second dog was barking aggressively at the officers in the basement and was preventing them from safely sweeping the basement. Mark Brown's testimony about the timing of when he heard the shots and the lack of barking he heard when the officers approached the residence is not material to whether, once inside the residence and out of Mark Brown's viewpoint, the dogs posed an imminent threat to the officers' safety.

Although the factual background in *Altman* is somewhat different than the background of this case, the Fourth Circuit similarly held that privately owned dogs were property protected by the Fourth Amendment, and that the officers did not violate the plaintiffs' Fourth Amendment rights because the seizures of those dogs were reasonable. *Altman*, 330 F.3d at 196. In *Altman*, animal control officers shot and killed several dogs that were running at large in the city. *Id*. It was undisputed that the dogs were running at large with regard to each dog shooting. *Id*. at 206. In most of the incidents, the dogs had already attacked people in the city. *Id*. at 206−07. In one instance involving a pit bull, "a dangerous breed of dog," while it had not attacked any person, the pit bull's "behavior toward the meter reader was sufficiently aggressive to cause [the witness] to call the police. Responding to that call, [the animal control officer] was immediately confronted with a fleeing dog." *Id*. at 206. The *Altman* court stated that "[i]t was not unreasonable for [the animal control officer] to conclude, in that split second as [the pit bull] sped away, that he could not safely capture the animal." *Id*. The Fourth Circuit ultimately held that the officers acted reasonably in seizing the dogs. *Id*. at 207. It further noted that:

> [W]e are not saying the officers' responses in these cases were the best possible responses. We are only saying that, under the circumstances existing at the time the officers took the actions and in light of the facts known by the officers, their actions were objectively reasonable. . . . Even dog owners can find their pets to be unpredictable at times. How much more so a person who is not intimately familiar with the behavior of the particular animal (as neither Officers Perdue nor Moxley were in any of these cases) and who is forced to confront the dog for the first time in an unsupervised, unenclosed environment.

*Id*.

Similar to *Altman*, the officers here confronted two large pit bulls for the first time in an unsupervised environment where they were unleashed and in an enclosed space with the officers. Given Jones' criminal history, gang affiliations, the types of drugs he was suspected of distributing, the fact that the officers had no time to plan for the dogs, in addition to the officers' unrebutted testimony that the dogs either lunged or were barking aggressively at the officers, the nature and size of the dogs, the fact that the dogs were unleashed and loose in a small residence, all culminate into a finding that the officers acted reasonably when they shot and killed the two dogs.

Viewing the facts and all reasonable inferences in the light most favorable to Plaintiffs, we find that a jury would conclude that Officer Klein, Officer Young, and Officer Case acted reasonably in shooting and killing Plaintiffs' dogs. Summary judgment was therefore appropriate.

### B. Municipal Liability

Plaintiffs next argue that the district court erred in granting the City's motion for summary judgment because the City's failure to train officers on how to recognize whether a dog is dangerous and how to use non-deadly methods to restrain dogs during search warrant executions amounted to deliberate indifference that resulted in the death of their dogs. Defendants argue that the district court did not err in granting the City's motion because: (1) the City cannot be municipally liable because there was no constitutional violation by the individual officers; and (2) even if there was a constitutional violation, the City is not liable because Plaintiffs failed to present evidence that the City's failure to act amounted to deliberate

indifference.  We find that the district court did not err in granting judgment on Plaintiffs' *Monell* claim.

To succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the "moving force" behind the deprivation of the plaintiff's constitutional rights.  *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 606−07 (6th Cir. 2007) (citing *Monell*, 436 U.S. at 694).  "A systematic failure to train police officers adequately is a custom or policy which can lead to municipal liability."  *Miller v. Sanilac Cty.*, 606 F.3d 240, 255 (6th Cir. 2010) (citations omitted).  "The inadequacy of police training only serves as a basis for § 1983 liability 'where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact.'" *Slusher v. Carson,* 540 F.3d 449, 457 (6th Cir.2008) (quoting *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)).  To establish deliberate indifference, the plaintiff "must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher v. Harden,* 398 F.3d 837, 849 (6th Cir.2005).

Because a finding of liability in the context of a failure to train amounts to a judicial determination that "the city itself [decided] to violate the Constitution," the Supreme Court has imposed "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* 563 U.S. 51, 61–62 (2011) (internal quotation marks and alterations omitted).  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train," although there are rare circumstances in which "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 62, 64 (internal quotation marks omitted).

> The Supreme Court stated, that in the case of police officers, it will not:
>
> suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter

resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.

*Harris*, 489 U.S. at 391.

In this case, the district court found that the Resistance and General Firearms Policy defined dangerous animals and vicious dogs, and discussed when the use of a firearm may be drawn. The court stated that the resistance policy "is consistent with protecting the officers from hostile animals." (R. 72 at 49.) The court held that the events that transpired in this case were not a direct result of the resistance policy, and on this ground, there is no "basis for municipal liability." (*Id.*) We agree.

On the claim that the BCPD did not have a policy on how to treat dogs in the search of a house, "despite a recurring problem that amounts to deliberate indifference," the court stated that it is "something that may well become a viable claim as we move forward, but . . . on the present record the one thing that's clear is that there isn't much of a policy, practice, not just in Battle Creek but throughout the country, on how to deal with this beyond the general statements of how officers are supposed to respond to resistance." (*Id.* at 49.) The court then held that based on the "present record, even crediting everything that's in the record, there's no history, credible history at least, that leads to needless killing of animals in the course of searches in Battle Creek . . . and . . . under those circumstances the fairly stringent standards for municipal liability by inattention could [not] be met here." (*Id.* at 49−50.)

We find that Plaintiffs failed to provide evidence establishing deliberate indifference, in other words, that there were prior instances of unconstitutional conduct demonstrating that the City ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.

Plaintiffs argue that the City did not have a policy instructing officers on when and in what circumstances they should use deadly force against animals. They further claim that there was an unofficial tally system wherein officers would keep a running list of the animals they shot by putting stickers on their lockers to "brag[ ]" about it, and that it was not uncommon for officers to encounter animals during searches or in the scope of their duties. (R. 61-14, Officer

Angel Rivera Dep., PageID# 11−13, 20−22, 30−33.)  With regard to the tally system, Plaintiffs presented evidence from Officers Angel Rivera, Brad Palmer, Joseph Wilder, and Scott Marshall.  Officer Rivera testified that "it was very common that officers would talk about [how many animals they shot]," and that he could not identify individual officers who did this because "there were so many of them just bragging about it."  (Rivera Dep. 30−31.)  With regard to the frequency with which the City's officers encounter animals during searches, Officer Klein testified that "[m]any of the search warrants [he and his team] have executed [have] [involved] aggressive dogs," and that it was "not uncommon" when he was "working road patrol" and when he was on the ERT.  (Klein Dep. 56−57.)

Despite this evidence, we find that Plaintiffs failed to provide evidence showing that "the need" for a specific policy and/or training "was so obvious and the likelihood that the inadequacy would result in the violation of constitutional rights was so great that the [City] as an entity can be held liable here for the extent of [Plaintiffs'] determined damages." *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989).  This is largely because there was no evidence indicating that participation in the tally system was systematic or widespread, and there was no evidence that the police department's supervisory personnel sanctioned such a system or even knew of its existence.

For one, Plaintiffs' constitutional rights were not violated.  The seizures of the dogs in this case were reasonable given the specific circumstances surrounding the raid.  This finding alone is fatal to their municipal liability claim. *See Powers*, 501 F.3d at 606−07 (stating that in order to succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated *and* that a policy or custom of the municipality was the "moving force" behind the deprivation of the plaintiff's constitutional rights) (citation omitted).

Second, Plaintiffs did not provide any evidence demonstrating prior instances of unconstitutional dog shootings by the City's police officers.  Plaintiffs appear to generally claim that because there have been numerous instances of animal deaths resulting from officer shootings during searches and that officers face animals frequently, these facts demonstrate prior instances of unconstitutional conduct.  Plaintiffs do not show how these prior animal shootings were unconstitutional. *See Miller*, 606 F.3d at 255 (affirming the district court's grant of

summary judgment in favor of the county-defendant because the plaintiff did not show "that there was deliberate indifference based on prior instances of unconstitutional conduct").

Third, this case does not present one of those rare circumstances in which "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick,* 563 U.S. at 62, 64 (internal quotation marks omitted). The tally system Plaintiffs mention, while not an example of model police behavior, does not provide proof of a pre-existing pattern of similar constitutional violations by police officers. Plaintiffs were unable to provide information as to the number of officers that participated in this tally system, the number of shootings that were tallied, or the number of shootings that were unreasonable exercises of force. Unsubstantiated testimony from a few officers generally describing the tally system while not providing details about the number of officers participating in it or the number of shootings tallied is neither persuasive nor meaningful. Notwithstanding, Plaintiffs provided no evidence that this tally system was sanctioned or encouraged by the BCPD, or that BCPD knew about it and knowingly disregarded it.

As the district court stated, based on the "present record, even crediting everything that's in the record, there's no history, credible history at least, that leads to needless killing of animals in the course of searches in Battle Creek . . . and . . . under those circumstances the fairly stringent standards for municipal liability by inattention could [not] be met here." (R. 72 at 49−50.) Therefore, we find that the district court did not err in granting the City's motion for summary judgment.

## C. Excessive Force

Finally, Plaintiffs argue that the district court erred in granting Defendants' motion for summary judgment as to the officers' use of force in breaching the front door. Cheryl Brown stated in her deposition that it would cost $240 to replace the front door. (R. 61-7, Cheryl Brown Dep., PageID# 75.) Specifically, Plaintiffs argue that the use of the ram to breach the door was unreasonable because Mark Brown offered the front door key to the officers prior to the breach, and there was no objective evidence at the scene requiring immediate breach of the door since

(1) Vincent Jones, the subject of the search, was in custody, and (2) there was no evidence that the home was occupied. Defendants argue that the district court did not err because it was reasonable for the officers to force entry because they had information that Jones used the residence to distribute cocaine and heroin, and they did not know whether gang members would be in the residence armed and ready to fire at the officers.

The Supreme Court has explained: "[O]fficers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258 (1979). Like other Fourth Amendments inquiries, "the manner in which a warrant is executed"—including the damage of property—"is subject to later judicial review as to its reasonableness." *Id*. "The general touchstone of reasonableness which governs Fourth Amendment analysis . . . governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (internal citation omitted).

Several facts support the conclusion that the officers in this case acted reasonably in breaching the front door without devising a method of entry that would not damage the door. First, Vincent Jones, although detained when the raid occurred, was identified as dangerous, known to carry firearms while distributing drugs, and known to be accompanied by other gang members. Second, the officers had information that Jones was distributing drugs out of the residence and they did not want anybody inside the residence to destroy evidence of drug distribution. Third, as Defendants' counsel stated during oral argument, the officers would not have used the keys Mark Brown offered to give them because the officers would not have had any idea whether those keys were the correct keys. Defendants' counsel persuasively argued that Mark Brown could have given the officers the wrong set of keys, and the resulting delay could have given somebody in the house the opportunity to destroy the drugs or time to prepare to attack or shoot the officers as they entered the residence. *See United States v. Banks*, 540 U.S. 31, 40 (2003) ("[W]hen circumstances are exigent because a pusher may be near the point of putting his drugs beyond reach, it is imminent disposal . . . that governs when the police may reasonably enter"). Finally, the damage to the front door was "slight." *See United States v. Whisnant*, 391 F. App'x 426, 430 (6th Cir. 2010) (holding that officers acted reasonably in cutting hole in the wall, in part, because the damage to the defendant's property was "slight").

## III.   CONCLUSION

For the aforementioned reasons, we hold that the district court did not err in granting Defendants' motion for summary judgment.   Accordingly, we **AFFIRM** the district court's judgment.