**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1957

_____

JEFFREY W. BLETZ, personally, and as the guardian of
DJF, a minor; LINDSEY J. BLETZ

Appellants

v.

JEREMY W. CORRIE
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1:16-cv-00717)
District Judge: Honorable Yvette Kane
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 31, 2020

Before:  CHAGARES, RESTREPO, and BIBAS, *Circuit
Judges*

(Filed: September 9, 2020)
_____

Devon M. Jacob
Jacob Litigation
P.O. Box 837
Mechanicsburg, PA 17055

     *Counsel for Appellants*

Sean A. Kirkpatrick
J. Bart DeLone
Office of Attorney General of Pennsylvania
15th Floor, Strawberry Square
Harrisburg, PA 17120

     *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

RESTREPO, *Circuit Judge.*

This civil rights action stems from the shooting of a family's pet dog by a law enforcement officer as he served an arrest warrant at their home. The District Court granted summary judgment to Pennsylvania State Trooper Jeremy W. Corrie on the Bletzes' two claims, a 42 U.S.C. § 1983 claim for unlawful seizure under the Fourth Amendment and an intentional infliction of emotional distress claim under Pennsylvania law. The Bletzes appeal the District Court's Fourth Amendment ruling. For the reasons set forth in this opinion, we will affirm the District Court's judgment.

**I**

On May 1, 2014, Jeffrey W. Bletz was living in York County, Pennsylvania with his daughter, Lindsey J. Bletz, and young grandson, DJF. That morning, they were all at home with their pet dog, Ace, a Rottweiler/Labrador Retriever mix who was then seven years old. Jeffrey opened the back door to let Ace outside. He was unaware that, at that moment, Trooper Corrie and other officers from multiple law enforcement agencies were swarming his property to serve an arrest warrant on an armed robbery suspect believed to be living there.

Trooper Corrie approached the house from the left side (facing the front), along with Trooper Richard T. Drum. As they approached, Trooper Corrie heard Trooper Drum yell "whoa" several times from behind, his voice becoming increasingly "more excited," prompting Trooper Corrie "to turn around." App. 506. As he turned, he saw a large dog coming toward him, "already mid-leap, within an arm's reach," at about chest height. App. 506. Ace "was showing [his] teeth, and growling in an aggressive manner," making a low-pitched noise, like a combination of a "growl and a bark." App. 506, 124.

Trooper Corrie says he "backpedaled to create distance," and Ace circled around him to his right, "attempt[ing] to attack [him] from that direction." App. 507. Trooper Corrie "believe[s] there was another snarl," and then he fired a shot. App. 125–26. Ace "began to come after [him] again from [his] right side," then "abruptly changed directions, . . . turned its body and charged [him] again." App. 126. The dog did not jump a second time before Trooper Corrie fired a second shot—and then a third. The third shot struck Ace on

3

his right side. The dog yelped, ran to Jeffrey, who was then near the garage, laid down at his feet, and died within minutes. A necropsy of Ace showed that the bullet entered through the "right upper chest" and exited through the "left lower chest," which "indicat[es] that the bullet travelled from right to left across the chest and slightly downward." App. 446.

Trooper Drum, who was with Trooper Corrie during the encounter, recounted the incident to the State Police on May 27, 2014. He explained that Ace had behaved aggressively toward him before changing directions and running toward Trooper Corrie. Trooper Drum recounted that Trooper Corrie fired three shots when Ace was "right at the base of [Corrie's] feet" and "still in the aggressive manner." App. 497. The Bletzes did not witness the incident.

On April 29, 2016, the Bletzes initiated this action against Trooper Corrie claiming unlawful seizure under the Fourth Amendment and intentional infliction of emotional distress under Pennsylvania law. After discovery, Trooper Corrie moved for summary judgment on both counts, and on March 26, 2019, the District Court granted his motion. The Bletzes now timely appeal the District Court's ruling on the Fourth Amendment claim; they do not challenge its conclusion on the state law claim.[1]

---

[1] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and we exercise jurisdiction under 28 U.S.C. § 1291.

## II

### A

We exercise plenary review over a district court's grant of summary judgment, and we apply the same standard as the district court. *Adams v. Zimmer US, Inc.*, 943 F.3d 159, 163 n.4 (3d Cir. 2019). "Summary judgment is appropriate where, construing all evidence in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Sec'y U.S. Dep't of Labor v. Kwasny*, 853 F.3d 87, 90 & n.5 (3d Cir. 2017) (quoting Fed. R. Civ. P. 56(a) and citing *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015)). A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the burden of demonstrating that there is no genuine issue of material fact and that judgment as a matter of law is appropriate. *Id.* The court must review the record as a whole, draw all reasonable inferences in favor of the nonmoving party, and must not "weigh the evidence or make credibility determinations." *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Armour v. Cty. of Beaver, Pa.*, 271 F.3d 417, 420 (3d Cir. 2001)).

### B

We must determine whether the District Court properly granted summary judgment in favor of Trooper Corrie on the Bletzes' Fourth Amendment claim. Based on the analysis that follows, we will affirm the District Court's ruling.

5

**1**

The Fourth Amendment to the United States Constitution, applicable to the states by way of the Fourteenth Amendment, guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210 (3d Cir. 2001), this Court held that people have a possessory interest in their pets, and "the killing of a person's dog by a law enforcement officer constitutes a seizure under the Fourth Amendment." Thus, to be constitutionally permissible, an officer's conduct in fatally shooting a pet "must have been reasonable." *Id.* (internal quotations omitted).

To assess the reasonableness of a seizure, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). A "disproportionately intrusive" seizure would be unreasonable. *Id.* As always, in Fourth Amendment cases, a court must be mindful to judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989) ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation.").

Our precedent in *Brown* serves as an example of when a Fourth Amendment claim regarding the shooting of a pet

should proceed to trial. In that case, a pet Rottweiler wearing a bright pink collar with tags had wandered outside the yard and into an adjacent parking lot. 269 F.3d at 208–09. An officer saw the dog, and as he approached her, the dog "barked several times and then withdrew." *Id.* at 209. The officer walked toward her and stood about ten to twelve feet from her, at which time the dog stayed still, not barking or growling. *Id.* A bystander stated that the dog "did not display any aggressive behavior" toward the officer. *Id.* The dog's owner looked out her window and saw the officer and her dog facing each other in the parking lot—then she saw the officer reach for his gun. *Id.* She screamed, "That's my dog, don't shoot!" *Id.* The officer hesitated for a few seconds, pointed his gun at the dog, and shot the dog five times. *Id.* The officer had "intentionally and repeatedly shot a pet without any provocation and with knowledge that it belonged to the family who lived in the adjacent house and was available to take custody." *Id.* Weighing this conduct against the state's "interest in restraining [a dog] so that it will pose no danger to the person or property of others," we concluded that there was a triable issue as to whether the officer's shooting of the dog constituted an unlawful seizure. *Id.* at 210–11.

We noted, however, that "the state's interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger." *Id.* at 210. In such a case, "the state's interest may even justify the extreme intrusion occasioned by the destruction of the pet in the owner's presence." *Id.* at 210–11. This hypothetical proves prescient here.

While *Brown* serves as an example of when the reasonableness of an officer's conduct presents a triable issue, we look to our sister circuits for examples of when an officer's

7

conduct has been deemed reasonable as a matter of law. The Sixth Circuit has held that officers acted reasonably when they fatally shot two pit bulls that "either lunged or were barking aggressively" at them, while the dogs were "unleashed and loose in a small residence." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 570–72 (6th Cir. 2016). At the time, the officers were searching the home of a suspect who had a criminal history and gang affiliations. *Id.* at 568. In another case where an officer was executing a search warrant inside a home, the D.C. Circuit held that an officer acted reasonably in shooting a dog that had bit a fellow officer's leather boot hard enough to puncture it only seconds earlier. *Robinson v. Pezzat*, 818 F.3d 1, 5, 12 (D.C. Cir. 2016). And in a case where officers responded to separate incidents of dogs roaming in public places, the Fourth Circuit held that officers acted reasonably in using lethal force to protect the public when the dogs had either attacked someone that day or were known to be aggressive. *Altman v. City of High Point, N.C.*, 330 F.3d 194, 197–99, 204–05 (4th Cir. 2003) (noting that "[w]hen a dog leaves the control of his owner and runs at large in a public space, the government interest in controlling the animal . . . waxes dramatically, while the private interest correspondingly wanes").

In line with our precedent in *Brown* and the persuasive rulings of our sister circuits, we hold that the use of deadly force against a household pet is reasonable if the pet poses an imminent threat to the law enforcement officer's safety, viewed from the perspective of an objectively reasonable officer. *See, e.g.*, *Brown*, 269 F.3d at 210–11 (stating that "the state's interest in protecting life and property . . . may even justify the extreme intrusion occasioned by the destruction of the pet in the owner's presence"); *Battle Creek*, 844 F.3d at 568

8

("[A] police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety.").

**2**

Here, the state had an important interest in protecting the safety of its officers while they undertook a coordinated effort to serve an arrest warrant on an armed robbery suspect. To be sure, it was an "extreme intrusion" for Trooper Corrie to fatally shoot the Bletzes' pet dog. *Brown*, 269 F.3d at 211; *see also Altman*, 330 F.3d at 205 (stressing the "appreciable" private interests involved, as "[d]ogs have aptly been labeled 'Man's Best Friend,' and certainly the bond between a dog owner and his pet can be strong and enduring"). We must balance these considerations to determine whether Trooper Corrie's actions were objectively reasonable under the circumstances. *See Place*, 462 U.S. at 703. This requires us to assess whether Ace posed an imminent threat to Trooper Corrie's safety.

Trooper Corrie bears the burden of demonstrating that there is no genuine issue of material fact that could cause a reasonable jury to find that he unlawfully seized the Bletzes' dog. *See Willis*, 808 F.3d at 643. Both people who witnessed the incident, Trooper Corrie and Trooper Drum, testified that Ace aggressively charged at Trooper Corrie, growling and showing his teeth, as though about to attack—and that he did not relent until subdued by the third bullet. Trooper Corrie reasonably interpreted Ace's behavior as a threat of imminent attack. Considering that he had to make a split-second decision

9

while participating in a coordinated effort to arrest an armed-robbery suspect, he acted reasonably in shooting Ace.

The Bletzes argue that material facts are disputed because Trooper Corrie's testimony that he shot Ace on his right side conflicts with his testimony that he shot because the dog charged at him. In support of this argument, the Bletzes cite the testimony of their expert, James W. Crosby, who opined that because the dog was "positioned laterally to Corrie," it "was not engaged with Corrie in any way when Corrie's third round was fired." App. 458.

Even though Ace happened to be moving laterally relative to Trooper Corrie when he was struck, this does not rule out the dog's continued aggression, and plaintiffs do not cite any admissible evidence tending to show that Ace displayed no signs of aggression signaling an imminent attack. The Bletzes were not present to witness the incident. Rule 56(c)(1)(A) requires that parties "asserting that a fact . . . is genuinely disputed" support that claim "by citing to particular parts of materials in the record." Here, the evidence cited does not suggest Ace refrained from acting aggressively at every stage of the altercation.

Further, Ace approached the officers in the context of a coordinated effort to serve an arrest warrant on an armed robbery suspect. Considering all of this, Trooper Corrie acted reasonably in shooting Ace, whose behaviors presented an imminent threat to his physical safety.

The Bletzes further argue that Trooper Corrie acted unreasonably because he was not provided and did not pursue training regarding the "safe handling of dogs" and neglected to attempt nonlethal means of subduing Ace. Appellants' Br. 10.

10

However, the touchstone of a Fourth Amendment analysis is whether the officer acted reasonably under the circumstances. *See Brown*, 269 F.3d at 210 (citing *Place*, 462 U.S. at 703). It is not whether the officer received or could have pursued a certain level of training. We offer no opinion on Trooper Corrie's training or potential alternatives to lethal force—and this opinion should not be read as endorsing his reaction or stating that he implemented "the best possible response[]." *Altman*, 330 F.3d at 207. "We are only saying that, under the circumstances existing at the time the officer[] took the actions and in light of the facts known by the officer[], [his] actions were objectively reasonable." *Id.*; *see also Graham*, 490 U.S. at 396 (stating that we must not view the situation with "the 20/20 vision of hindsight").

In conclusion, Trooper Corrie, while participating in a coordinated effort to serve an arrest warrant on an armed robbery suspect, reasonably used lethal force against a dog who, unrebutted testimony shows, aggressively charged at him, growled, and showed his teeth, as though about to attack.[2] We will thus affirm the District Court's order granting summary judgment.

---

[2] Given our conclusion that the shooting of Ace did not violate the Fourth Amendment, we will not address whether the law was "clearly established" for purposes of qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").